**UNITED STATES, Appellee,**

v.

**Spencer D. WALES, Captain, U.S. Air Force, Appellant.**

No. 63,935.
ACM 27300.

U.S. Court of Military Appeals.

Argued June 14, 1990.
Decided Sept. 28, 1990.

302

For Appellant: *Captain Darla G. Orndorff* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain David G. Nix* (argued); *Colonel Robert E. Giovagnoni* and *Major Paul H. Blackwell,* Jr. (on brief).

### Opinion

EVERETT, Chief Judge:

Once again, we must review an officer's conviction for fraternizing with an enlisted person.[1] Once again, the gravamen of the fraternization charge is that there was sexual intercourse between the two.[2] Once again, the fraternization charge has been joined for trial with an adultery charge arising out of sexual intercourse between the same two persons.[3]

## I

### A

Captain Wales was charged in two specifications with fraternization, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The first specification alleged that he

did, while on a military deployment to Fliesland, Norway, at divers times between on or about 22 September 1987 and on or about 7 October 1987, know-

ingly fraternize with Staff Sergeant Elizabeth A. Alcon, an enlisted person in the United States Air Force, then *under his military supervision,* on terms of military equality, to wit: by meeting with her in his room for personal reasons; by allowing her to spend the night in his room; and by engaging in acts of sexual intercourse with her; in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality.

(Emphasis added.) The second specification asserted that he

did, in Oslo, Norway, while returning from a military deployment, on or about 8 October 1987, knowingly fraternize with Staff Sergeant Elizabeth A. Alcon, an enlisted person in the United States Air Force, who was *under his military supervision* during the deployment, on terms of military equality, to wit: by sharing a hotel room with her and by engaging in sexual intercourse with her; in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality.

(Emphasis added.)

Charge II alleged a violation of Article 133, UCMJ, 10 USC § 933, in that Captain Wales, "a married man, did, in Utah, at divers times between on or about 9 October 1987 and on or about 17 October 1987, wrongfully commit adultery with Staff Sergeant Elizabeth A. Alcon, United States Air Force, a married woman, not his wife, to the disgrace of the armed forces."

Prior to trial, the military judge ordered a new pretrial investigation under Article 32, UCMJ, 10 USC § 832, because the hearing officer had unreasonably denied a continuance to permit the presence of appel-

1. *See, e.g., United States v. Jefferson,* 21 MJ 203 (CMA 1986); *United States v. Walker,* 21 MJ 74 (CMA 1985); *United States v. Johanns,* 20 MJ 155 (CMA), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985); *United States v. Rodriguez,* 18 MJ 363 (CMA 1984).

2. *See* cases cited in n.1, *supra.*

3. *See* cases cited in n.1, *supra. See also United States v. Appel,* ACM 27462, unpublished, 1989 WL 90527 (Kastl, J., concurring) (July 25, 1989).

lant's civilian counsel.[4] After the second pretrial investigation had been completed and prior to trial, trial counsel on her own initiative deleted from the two fraternization specifications the language alleging that Sergeant Alcon was under the military supervision of Captain Wales. Consequently, the defense moved to dismiss the fraternization specifications on the ground that, under *United States v. Johanns,* 20 MJ 155 (CMA), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985), an essential element of the offense had been deleted. This motion—like several other defense motions—was denied; and the case proceeded to trial. Captain Wales was found guilty of the fraternization specifications, as amended by trial counsel, and of the adultery charge. His sentence was dismissal from the Air Force.

The convening authority approved the sentence; and the Court of Military Review affirmed the findings and sentence. 29 MJ 586 (1989). This Court granted review of these issues assigned by appellant:

I

WHETHER SPECIFICATIONS 1 AND 2 OF CHARGE I FAIL TO ALLEGE AN OFFENSE BECAUSE THEY DO NOT:

A

ALLEGE APPELLANT WAS IN A SUPERVISORY RELATIONSHIP WITH SSGT ELIZABETH ALCON AND THEREFORE VIOLATED THE AIR FORCE CUSTOM AGAINST WRONGFUL FRATERNIZATION.

B

STATE ANY WORDS THAT ALLEGE CRIMINALITY.

II

WHETHER APPELLANT WAS PREJUDICED WHEN THE MILITARY JUDGE FAILED TO INSTRUCT THE COURT MEMBERS THAT A SHOWING OF A SUPERVISORY OR COMMAND RELATIONSHIP IS NECESSARY TO VIOLATE THE CUSTOM OF WRONGFUL FRATERNIZATION IN THE AIR FORCE.

Also, the Court specified these two issues:

I

WHETHER THE AIR FORCE HAS FAILED TO SUFFICIENTLY ESTABLISH A CUSTOM AGAINST FRATERNIZATION SINCE *UNITED STATES V. JOHANNS* SO AS TO PLACE A SERVICE PERSON ON NOTICE OF SAID CUSTOM SUCH THAT A VIOLATION MAY BE CRIMINALLY ENFORCEABLE UNDER THE UNIFORM CODE OF MILITARY JUSTICE.

II

WHETHER THE SPECIFICATIONS OF CHARGE I [WRONGFUL FRATERNIZATION] ARE MULTIPLICIOUS FOR FINDINGS AND SENTENCE.

B

The evidence presented at trial might provide the basis for a soap opera. It concerns two troubled marriages—that of Staff Sergeant Elizabeth Alcon and her husband, Staff Sergeant Louie Alcon, and that of Captain Wales and his wife, Navy Lieutenant Commander Carol Wales. Both Captain Wales and Elizabeth Alcon had been previously married and had children. By the time of appellant's trial, the Alcons had been divorced; and Wales and his wife were awaiting a divorce decree.

The evidence established that Captain Wales and Elizabeth Alcon had worked in the same office at Hill Air Force Base, Utah, but that he had not been her direct supervisor. In September 1987, these two and a Lieutenant Parrish comprised a three-person detachment that was deployed

---

4. The military judge also directed that the second pretrial investigation be conducted by a different investigating officer.

for 2 weeks to Fliesland, Norway. Although there were no specific orders placing Staff Sergeant Elizabeth Alcon under appellant's command, he was the ranking officer in the detachment, and clearly he had overall supervisory authority over its other two members.

There is no indication that, before they reached Norway, Wales and Elizabeth Alcon had developed any intimate relationship. However, after their arrival, they went out with a group for drinking and dancing; and the two began to discuss their respective unsatisfactory marriages. As a result of the empathy that developed, Elizabeth Alcon went to bed with Wales. However, their behavior was discreet, for, as Lieutenant Parrish testified, he had no belief at the time that an affair was going on between them.

Elizabeth Alcon's immunized testimony established that, while at Fliesland, she and Captain Wales regularly had sexual intercourse; that, as they returned from the deployment and stayed overnight in Oslo, they again engaged in sexual intercourse; and that, upon returning to Utah, she and Captain Wales continued their relationship. Indeed, twice they had intercourse at his home, while his wife was away. Appellant's pretrial statement to an investigator conformed to her testimony.

Staff Sergeant Louie Alcon testified that he had had very little contact with appellant before his wife's deployment to Norway in September 1987. Indeed, apart from some occasions when appellant had answered Louie's telephone calls to his wife at her office, the only time he had contact with Captain Wales was at an office party attended by the Alcons and by Wales and his wife.

After Elizabeth had returned from Norway, she had been cool to him and ultimately had revealed that there was another man in her life. When finally she also disclosed the identity of her lover, Louie initiated the investigation which ultimately led to appellant's trial.[5] Louie admitted that, even prior to September 1987, he and Elizabeth had occasionally experienced domestic difficulties and that there had been some mention of divorce. However, he maintained that a possibility of saving the marriage had still existed until his wife went to Norway.

Understandably, Staff Sergeant Louie Alcon testified that his respect for Captain Wales as an officer had vanished as a result of these distasteful events; and, indeed, he now felt somewhat more skeptical about officers in general. The Government offered testimony from other witnesses as to possible harm to the military community that had resulted from appellant's relationship with Staff Sergeant Elizabeth Alcon.

To establish that the Air Force had a custom which prohibited fraternization, the Government asked the military judge to take judicial notice of paragraph 7(a) of Air Force Regulation (AFR) 30–1, dated May 4, 1983, which concerns Air Force Standards. This regulation—which does not purport to be punitive—states:

> Professional relationships are essential to the effective operation of the Air Force. In all supervisory situations, there must be a true professional relationship supportive of the mission and operational effectiveness of the Air Force. There is a long-standing and well-recognized custom in the military service that officers shall not fraternize or associate with enlisted members under circumstances that prejudice the good order and discipline of the Armed Forces of the United States.

After the evidence had been received, the military judge reviewed his proposed instructions with counsel. In this connection, there was discussed the importance of a "chain of command or supervisory relationship" between Captain Wales and Staff Sergeant Elizabeth Alcon in order for the Government to prove appellant's guilt of fraternization. According to trial counsel:

> The panel must find as a credible, believable fact in the case that there existed

5. He conceded that one reason for his continuing to encourage prosecution of Captain Wales was to improve his position in a child-custody dispute with Elizabeth.

some chain-of-command or supervisory relationship. But that would be one of the facts to consider in proof beyond a reasonable doubt of element four.[6] That would not be a separate element to be proven beyond a reasonable doubt.

Subsequently, the prosecutor reiterated:

We would suggest the wording be that they must find as a credible fact, or as—we don't want to infer they must find beyond a reasonable doubt. But that they, in order to find number four beyond a reasonable doubt they must find as a credible fact in this case or as one of the facts of this case that there did exist some type of chain-of-command or supervisory relationship between the two.

When the military judge asked the defense for comments on this "proposal by the prosecution to add that requirement that the court [members] find that Sergeant Alcon must have been either under the command or supervision of the accused," the civilian defense counsel replied that

we're going back to what we were arguing under the motions. It is we, the defense, who are arguing that an element of the offense that must be proven was that she was under the supervision of the accused.

If the Government is now requesting that as an element of the offense, of course, we will go along with that. I think what Major Hollis is saying though, however, is that you need not find this to be an element of the offense, you merely simply find it as one of the facts. If that's what she's arguing, then I think—and the Court isn't prepared to change its earlier ruling, then I think we should just leave that alone. Because that's telling them that, hey, all you have to do is, you don't have to find that beyond a reasonable doubt. I think we should leave that question to argument unless the Court is prepared in effect to change its ruling that it made during the motions. We still feel that it is an essential element of the offense and it should have been charged and they have to prove it.

After further dialogue, trial counsel reiterated the Government's position that it "does not have to prove beyond a reasonable doubt that there existed a chain-of-command or supervisory relationship." Subsequently, in his instructions, the military judge advised the members of the general court-martial:

The Court is further advised that not all contact or association between officers and enlisted persons is an offense. Whether the contact or association in question is an offense depends on the surrounding circumstances. Factors that you should consider include whether the conduct has compromised the chain of command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, authority, or morale. The acts and circumstances must be such as to lead a reasonable person experienced in the problems of military leadership to conclude that the good order and discipline of the armed forces has been prejudiced by their tendency reasonably and substantially to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer.

## II

### A

In *United States v. Johanns, supra,* we reviewed a decision by the United States Air Force Court of Military Review which had set aside the accused officer's conviction for fraternization—alleged as a violation of Article 133 of the Uniform Code—but had affirmed his conviction of adultery, charged under Article 134. 17 MJ 862 (1983). The court below had found that, at the time of Johanns' alleged misconduct, the

---

**6.** This element was "[t]hat such fraternization violated the custom of" the Air Force "that officers shall not fraternize with enlisted members on terms of military equality." Para. 83b(4), Part IV.

Air Force had no custom prohibiting private sexual intercourse between an officer and an enlisted person not under his supervision. In light of that finding, we concluded that the fraternization conviction could not be upheld.

We noted, however, that the Air Force was free to promulgate general regulations prohibiting those relationships between officers and enlisted persons, which, in the view of that service, were harmful to good military discipline. *See also United States v. Pitasi*, 20 USCMA 601, 609, 44 CMR 31, 38 (1971). In this way, as required by the due process clause of the Fifth Amendment (*cf. Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957)), adequate notice would be provided to Air Force personnel as to what officer-enlisted relationships were criminal.

Central to the present case are the implications of the *Johanns* opinions of this Court and of the Air Force Court of Military Review. Appellant maintains that, in view of those opinions, he should not have been prosecuted. The Government resists this argument and calls attention to some developments not discussed in the *Johanns* litigation.

When Johanns was prosecuted for acts which had occurred in 1981, a 1977 edition of AFR 30–1 was applicable. However, at the time of appellant's trial, the May 3, 1983, version of the regulation was in effect; and it was relied on by the Government and judicially noticed by the military Judge.

The Government also points out that the alleged misconduct of Captain Johanns preceded promulgation of Manual for Courts-Martial, United States, 1984, which was the first Manual that had dealt specifically with fraternization. There, the offense is discussed in paragraph 83, Part IV; and a specific maximum punishment for fraternization—dismissal, 2 years' confinement, and total forfeitures—is authorized in paragraph 83e, Part IV.

Moreover, the 1984 Manual contains this sample specification for alleging fraternization:

In that _____ (personal jurisdiction data), did, (at/on board—location), on or about _____, knowingly fraternize with _____, an enlisted person, on terms of military equality, to wit: _____, in violation of the custom of (the Naval Service of the United States) (the United States Army) (the United States Air Force) (the United States Coast Guard) that officers shall not fraternize with enlisted persons on terms of military equality.

Para. 83f, Part IV.

According to the Government, promulgation of a revised version of AFR 30–1 and the specific references in the Manual to fraternization as a crime have made it clear that fraternization is prohibited by a military custom and that any servicemember should be aware of that custom. However, in *Johanns*, the Court of Military Review found that no custom in that service prohibited private sexual intercourse between an officer and an enlisted person as to whom he had no command or supervisory relationship.

In making this determination, the Court relied on a number of circumstances which had obfuscated the nature of the relationship between Air Force officers and enlisted persons. For example, in the allocation of housing, there often was no segregation of officer families from enlisted families. Housing was made available to Air Force couples in which one of the spouses was an officer and the other an enlisted person. Also officers clubs were opened to enlisted persons on some occasions; and vice versa. No requirement existed that, if an officer and enlisted person in the Air Force married, one of them should leave the service. As the Court of Military Review observed, "In addition, the Air Force has fostered management principles which encourage close interpersonal relationships at the expense of the strict, customary distinction between officers and airmen." 17 MJ at 866.

The record in this case does not indicate that the Air Force has materially changed

those of its policies which in 1983 reflected abandonment of any earlier custom imposing rigid separation of officers from enlisted person. Moreover, the Government can draw scant support from the edition of Air Force Regulation 30-1, of which the military judge took judicial notice at trial. This regulation, which refers to an Air Force custom concerning fraternization, was promulgated almost a half year before the Air Force Court of Military Review held that no custom existed prohibiting private sexual intercourse between an officer and an enlisted person as to whom he had no supervisory relationship. Although not cited in its opinion, the May 1983 edition of AFR 30-1 undoubtedly was known to the Court.

Finally, it still seems evident that the Air Force has a more liberal policy concerning officer-enlisted relationships than is true of the other services. For example, the only time that Staff Sergeant Louie Alcon had seen Captain Wales before his wife's deployment to Norway was at an office party hosted by Master Sergeant Lepore, the noncommissioned officer in charge of the office; and obviously officers and enlisted persons were mingling socially at that event.

Recently, Colonel J. Jeremiah Mahoney, an experienced Air Force military judge, wrote an extensive article on fraternization in that service. *See Fraternization: Military Anachronism or Leadership Challenge?*, 28 A.F.L.Rev. 153 (1988). He concluded that, after *Johanns*, private sexual intercourse between an officer and enlisted person in the Air Force cannot be punished absent a supervisory relationship between the two. Judge Mahoney was not pleased with this situation; and he recommended correction of past Air Force practices.[7] However, he also recognized that to change the existing situation "will require promulgation of a punitive regulation." *Id.* at 193.

■ Likewise, we conclude that, if the Air Force elects to prosecute and punish private sexual intercourse between an officer and an enlisted person not under his command or supervision, then—as we suggested in *Johanns* and earlier in *United States v. Pitasi, supra,* and as Judge Mahoney recommends—it must promulgate specific punitive regulations forbidding the unwanted conduct.[8]

Admittedly, the language of sample specifications in the Manual for Courts–Martial is relevant in determining what allegations are necessary and sufficient to charge an offense. However, in an Air Force fraternization case, the Manual's sample specification is of much less importance than in some other cases. The 1984 Manual was promulgated while the *Johanns* litigation was still underway, so it could not take into account the outcome of the opinion in that case. Furthermore, in light of the difference between the Air Force custom concerning fraternization and that which appears to exist in other services, it is quite conceivable that the sample specification

---

7. In his article cited in the text, he recommends the following steps, at a minimum:
 —Disqualify spouses of enlisted members from direct commission, Officer Training School, or Reserve Officer Training Corps unless the (other) enlisted spouse is simultaneously accepted for an officer-producing program;
 —Provide, in the administrative separation regulations for involuntary separation of officers who marry enlisted persons, and of enlisted persons who marry officers, and,
 —Eliminate regulatory provisions accommodating ... joint spouse assignments of partners of officer/enlisted marriages entered into after a specified date.

 Other occasions of fraternization, now condoned by regulation, should be eliminated:
 —Prohibit cross-club usage except for the limited purpose of attending officially sanctioned activities attended by substantially *all* members of a defined military unit or recognized private association; and
 —By attrition, but within a well-defined period, reestablished separate officer and enlisted housing areas on all Air Force bases.

8. On April 16, 1990, the Air Force issued Air Force Regulation 35-62, entitled "Policy on Fraternization and Professional Relationships." This regulation is not punitive, but it is more specific than its predecessors. *See also* OTJAG Letter, dated May 15, 1990, concerning "Fraternization and Professional Relationships."

might require additional allegations in an Air Force prosecution for fraternization that would not be necessary in the other services.

### B

Unlike the original language of the two fraternization specifications in this case, the sample specification contains no reference to any supervisory relationship between the officer and the enlisted person. In striking allegations that Captain Wales was in a supervisory relationship with Staff Sergeant Elizabeth Alcon, trial counsel apparently proceeded on the premise that these allegations must be surplusage because the sample specification contained no similar language. Unfortunately, however, deletion by the prosecutor of these allegations—sworn to by the accuser when the charges were preferred—created a confusion at trial which produced one of the issues on which we have granted review.

This confusion concerns whether the Government was contending that the *Johanns* decision no longer applied to the Air Force, so that now an officer in that service might be convicted of fraternization if he had private sexual intercourse with an enlisted person as to whom he had no command or supervisory relationship. If the prosecutor did intend to make such a contention—directly or indirectly—then she was misguided. In any event, her deletion of the language about a supervisory relationship constituted an implicit, but erroneous, government assertion that the deleted allegations were immaterial.

The confusion created by the deletion of these allegations was compounded by trial counsel's discussion of proposed instructions. Apparently, she wanted to have her cake and eat it too by having the military judge make some reference to a supervisory relationship as a fact to be considered but, nonetheless, allow the court members to determine guilt on the erroneous premise that such a relationship was not a *sine qua non* for convicting Captain Wales of fraternization.

■ Defense counsel claimed to have been confused by the events at trial. We also are confused; and we believe that the court members would have been, too. In light of *Johanns*, appellant was entitled to have the court members specifically advised that, unless they found beyond a reasonable doubt that appellant was the supervisor of Staff Sergeant Elizabeth Alcon at the time of the alleged fraternization, they could not find him guilty.

### III

We also are concerned about the way in which the Government sought to prove the existence of the custom which had allegedly been violated. According to the 1984 Manual for Courts-Martial:

In its legal sense, "custom" means more than a method of procedure or a mode of conduct or behavior which is merely of frequent or usual occurrence. Custom arises out of long established practices which by common usage have attained the force of law in the military or other community affected by them. No custom may be contrary to existing law or regulation. A custom which has not been adopted by existing statute or regulation ceases to exist when its observance has been generally abandoned. Many customs of the service are now set forth in regulations of the various armed forces. Violations of these customs should be charged under Article 92 as violations of the regulations in which they appear if the regulation is punitive.

Para. 60c(2)(b), Part IV. This language undoubtedly draws heavily on Colonel Winthrop's discussion in his authoritative textbook: *Military Law and Precedents*, Chapter IV (2d ed. 1920 Reprint).

To establish the Air Force custom concerning fraternization, trial counsel relied exclusively on the portion of AFR 30–1, of which the military judge took judicial notice. As we read its language, quoted previously in this opinion, 31 MJ at 304, it is unclear whether the last sentence of that quotation—which refers to the Air Force

"custom"—is limited by the introductory language of the preceding sentence: "In all supervisory situations ..." In other words, does this regulation itself imply that the custom is applicable only where there is a supervisory situation, or is the custom applicable in other situations?

 We also are troubled that a "custom" which is the basis for trying appellant for a crime authorizing the punishment of dismissal and 2 years' confinement was to be proved at trial by nothing more than a general statement in a nonpunitive regulation. According to Mil.R.Evid. 201(b), Manual, *supra*, "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known universally, locally, or in the area pertinent to the event or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." A military judge may properly take judicial notice of the contents of a regulation to prove the nature of those contents, when those contents have some independent effect—such as to show that someone had knowledge of the contents of the regulation.[9]

However, in this case, trial counsel asked the military judge to take judicial notice of a subparagraph in Air Force Regulation 30–1 in order to establish—as factually true—a statement therein that an Air Force custom existed. Use of the contents of the directive in this way raises an obvious hearsay problem, which probably cannot be resolved by resort to Mil.R.Evid. 803(8); and it also creates a confrontation issue under the Sixth Amendment.

Dean Wigmore concludes, contrary to some judicial intimations, that it is unnecessary to call more than one witness to establish the existence of a custom. *See* 7 Wigmore, *Evidence* § 2053 (Chadbourn rev. 1978). However, neither he nor any other

writer on evidence has suggested that the existence of a disputed custom can be established by a party without calling any witness at all.[10]

In short, we conclude that, if the Government wishes to prosecute fraternization on the basis of a custom in the military service, testimony must be offered by a knowledgeable witness—subject to cross-examination—about that custom. To require less is to allow the factfinder to make a determination that the custom exists without any indication on the record as to what that custom is. In other cases, elements of a crime must be proved by evidence of record. Even though we realize that the crime of fraternization is unique to military society, this does not justify disregarding the customary procedural safeguards required by due process.

In this case, the prosecution did not adequately discharge its burden of proving the nature of the custom on which it relied to convict Captain Wales under Article 134. Therefore, even apart from the pleading and instructional errors already discussed, his conviction of the two fraternization specifications cannot stand.

## IV

 We also are concerned about unreasonable multiplication of charges. *See United States v. Sturdivant*, 13 MJ 323 (CMA 1982). The two specifications of Charge I, as originally preferred, involved one continuing violation of an alleged custom which prohibits fraternization. However, the military judge took the position that each specification was separate for purposes of findings. We are of the view that, in a case like this, the specifications should have been consolidated—either at the beginning of trial or at least after the

9. For example, advisory material not having the force and effect of law but published by a government agency may be admissible as an exception to the hearsay rule in order to help establish the standard of care. *Cf. Muncie Aviation Corporation v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir.1975).

10. In neither his discussions of custom nor that of judicial notice does Winthrop indicate that the court-martial can take judicial notice of a custom, rather than receiving evidence thereof. *See* W. Winthrop, *Military Law and Precedents* 41–44, 318–19 (2d ed. 1920 Reprint).

findings. *Cf. United States v. Appel*, 31 MJ 314 (CMA 1990).

## V

■ We are aware that, as a practical matter, Captain Wales was tried for an adulterous relationship which commenced in Fliesland, Norway, continued at Oslo, Norway, and then resumed in Utah. Even though we set aside the fraternization specifications, the facts on which they were based would be admissible in aggravation during sentencing proceedings as to the remaining offense. Therefore, if the Government had only chosen to prosecute Captain Wales for adultery in Utah, the immediately preceding adulterous conduct, which was part of a continuous course of action involving the same two persons, could have been placed before the court members for their consideration in sentencing.

■ Under these circumstances we are tempted simply to affirm the sentence. However, we recall that, in *Johanns*, a rehearing on sentence was ordered by the Air Force Court of Military Review under somewhat similar circumstances. Therefore, in the interests of justice, it is only fair that we remand this case to the Court of Military Review, which, applying the standards set forth in *United States v. Sales*, 22 MJ 305 (CMA 1986), and *United States v. Suzuki*, 20 MJ 248 (1985), can then determine whether a rehearing should be ordered or whether it can properly reassess the sentence.

## VI

The decision of the United States Air Force Court of Military Review is reversed as to Charge I and the sentence. The findings of guilty thereon are set aside, and that Charge is dismissed. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court which may order a rehearing on sentence or reassess the sentence based on Charge II.

SULLIVAN, Judge (concurring in part and in the result):

I find the instructions too confusing to support a conviction for fraternization in the circumstances of this case. Because I find this point determinative, I need not comment on other parts of the lead opinion at this time.

COX, Judge (dissenting in part and concurring in the result):

The fundamental problem with this case and with *United States v. Appel*, 31 MJ 314 (CMA 1990), is that both accused were charged with violations of Article 134, to wit: fraternization. Art. 134, Uniform Code of Military Justice, 10 USC § 934. In both cases, an officer in the United States Air Force had an extra-marital, heterosexual affair with an enlisted woman serving either with him, or under his supervision or command. In this posture, the cases get all befouled with unnecessary legal questions, such as:

Does this type of affair violate a "custom" of the Air Force?

Does the affair constitute one crime, *or* does each episode constitute a separate and distinct offense?

How does the Government prove its case?

Can a judge take judicial notice of the "custom," or must a witness come forth? [1]

1. Under Article 134, Uniform Code of Military Justice, 10 USC § 934, fraternization is not about the propriety of private relationships between officers and enlisted members; it is about prejudice to good order and discipline in the armed forces. *Cf. United States v. Johanns*, 20 MJ 155, 162–65 (CMA 1985) (Cox, J., concurring in part and concurring in the result in part), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). The elements of fraternization are as follows:

(1) That the accused was a commissioned or warrant officer;

(2) That the accused fraternized on terms of military equality with one or more certain enlisted member(s);

(3) That the accused then knew the person(s) to be (an) enlisted members(s);

I am amazed by the fact that lawyers and judges quibble over whether a heterosexual, extra-marital affair between a commissioned officer and an enlisted person who serves in that officer's command constitutes misconduct which is either: (a) "prejudicial to good order and discipline" (Art. 134); or (b) "conduct unbecoming an officer and a gentleman" (Art. 133, UCMJ, 10 USC § 933).

These cases are very similar to running over a skunk while driving your car. You might not ever see the beast, but you certainly can smell it.

I only wish that I were as eloquent as Judge Nott, who is quoted with authority in Justice Blackmun's concurring opinion in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), as follows:

> In military life there is a higher code termed honor, which holds its society to stricter accountability; and it is not desirable that the standard of the Army shall come down to the requirements of a criminal code.

*Id.* 417 U.S. at 765, 94 S.Ct. at 2566, *citing Fletcher v. United States*, 26 Ct.Cl. 541, 562–63 (1891).

Justice Blackmun went on to say:

> The law should, in appropriate circumstances, be flexible enough to recognize the moral dimension of man and his instincts concerning that which is honorable, decent, and right.

417 U.S. at 765, 94 S.Ct. at 2566 (footnote omitted).

Because the conduct as alleged here is most certainly conduct "unbecoming" an honorable, decent, and moral man—"an officer and a gentleman"—most of the legal problems of the case dissipate if the accused officer is charged with a violation of Article 133, which prescribes that

> [a]ny commissioned officer, cadet, or midshipman who is convicted of conduct

unbecoming an officer and a gentleman shall be punished as a court-martial may direct.

There are two elements of proof under this statute, as follows:

> (1) That the accused did or omitted to do certain acts; and
>
> (2) That, under the circumstances, these acts or omissions constituted conduct unbecoming an officer and gentleman.

Para. 59b, Part IV, Manual for Courts–Martial, United States, 1984.

Certainly an accused can challenge the charges against him by asserting that they are too vague or that he lacked "fair notice" that his conduct was criminal. However, that is not the case here. I can think of no way this accused could have believed his adulterous liaison was acceptable conduct for him or any other commissioned officer who serves in a military force of the United States of America. Therefore, I must part company with the majority opinion.

I would not require the Air Force or the other military services to publish a punitive regulation telling every officer who possesses good moral judgment, a sense of ethics and duty, and a sense of what constitutes good leadership, what he already knows. I also would not require witnesses to come forward to testify.

Although quoting *Parker v. Levy, supra*, with authority, the majority opinion rejects the true heart, soul, and essence of that decision. Chief Judge Everett advances the notion either that conduct must be proscribed in some code or regulation or that some witnesses must come to court to inform the court members—fellow officers—of the "customs" or "traditions" of their service. I believe that, by definition, a "custom" or "tradition" is known to all officers; otherwise, by its own definition, if

(4) That such fraternization *violated the custom of the accused's service* that officers shall not fraternize with enlisted members on terms of military equality; and

(5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 83b, Part IV, Manual for Courts–Martial, United States, 1984 (emphasis added).

it is not accepted or known, it cannot be a "custom" or "tradition." That is what *Parker v. Levy, supra,* is all about. Indeed, it expressly rejects the idea that there must be some codification. The question under *Parker v. Levy, supra,* is whether an officer would have fair notice that his conduct was punishable.

I must acknowledge that sexual conduct between consenting adults of the opposite sex, even adulterous conduct, is rarely prosecuted in the Air Force. From the cases I have seen, each prosecution was "triggered" by the conduct becoming a problem for the accused's superiors. Thus, Captain Wales really is being prosecuted because his situation became a command problem when the cuckolded husband made loud noises about the affair. The same thing happened to Major Appel.

In *United States v. Berman,* 28 MJ 615 (AFCMR 1989), although he escaped without being court-martialed, bad things happened to a military judge when he became involved with a female trial counsel.[2] In *Berman,* Chief Judge Hodgson served notice as follows:

An impartial and disinterested trial judge is the foundation on which the military justice system rests, and *avoiding the appearance of impropriety is as important as avoiding impropriety itself.*

*Id.* at 616 (emphasis added).

Captain Johanns, the Air Force officer whose case set the standard for modern sexual behavior between officers and enlisted women in the Air Force, got in trouble because one of the women with whom he was involved was married to another Air Force member. *United States v. Johanns,* 20 MJ 155 (CMA), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985).

A female lieutenant who was accused of having a sexual affair with an enlisted man in a missile silo got in trouble when her enlisted husband assaulted her, hauled her off to the military police, and coerced a confession out of her. *United States v.*

*Haye,* 29 MJ 213 (CMA 1989). Interestingly enough, she also had an affair with her superior officer, but he got off with only nonjudicial punishment.

The common thread in all of the cases is that the sexual affair became a command problem. It was prejudicial to good order and discipline, and it was conduct unbecoming each of these officers.

Perhaps the lead opinion is correct. Maybe officers in the Air Force have developed a new morality, where sexual relationships between superiors and subordinates are acceptable. Certainly, the *Johanns* case suggests a new morality and customs in the Air Force different from those in the other services. Then again, maybe there is confusion. Maybe the leadership does need to give notice and publish a "punitive" regulation.

But I seriously doubt that to be true. I do believe that officers, court members, and military judges understand the distinctions between acceptable and unacceptable conduct, and that they are competent to apply the "customs" and "traditions" of their respective services to the facts of a particular case.

Article 133 gives every commander the tools he needs to test the conduct of officers serving within his command. Let the prosecution prove the facts, and let the members determine whether those facts constitute "conduct unbecoming an officer and a gentleman." That is what military justice is and has been about throughout the history of our country. *Parker v. Levy, supra.* Both the Court of Military Review and this Court are empowered to correct any injustices that arise from abuse of the awesome responsibility placed upon a court-martial. I adamantly resist any further codification of Article 133. *See United States v. Scott,* 21 MJ 345, 350 (CMA 1986) (Cox, J., concurring).

Obviously I have no serious dispute with the lead opinion regarding "proof of facts"

---

**2.** As Chief Judge Earl Hodgson so aptly put it, "Judges, like Caesar's wife, should always be above suspicion." *United States v. Berman,* 28 MJ 615, 616 (AFCMR 1989). The same is true for *all officers!*

in an Article 134 "fraternization case." How does one prove a custom? I just disagree that it needs to be proved when the facts are so abundantly clear as they are here. Furthermore, I believe that the military judge correctly instructed the members.

As to the remedy, I take no issue with that either. As far as I am concerned, appellant got a fair trial; his conduct was proved beyond a reasonable doubt; and his conduct was, under the facts then and there existing, "prejudicial to good order and discipline" in the Air Force. Whether we call his conduct "adultery," "fraternization," "unbecoming," or all of the above, is really not the important aspect of this case. I do not object to having the Court of Military Review take a fresh look at the sentence in light of my Brother's concerns about Air Force customs or the lack thereof.