# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39352**

———————————

**UNITED STATES**
*Appellee*

v.

**Milford C. SCOTT**
Captain (O-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 May 2019

———————————

*Military Judge:* Joseph S. Imburgia.

*Approved sentence:* Dismissal and confinement for 8 months. Sentence adjudged 24 June 2017 by GCM convened at Davis-Monthan Air Force Base, Arizona.

*For Appellant:* Major Todd M. Swensen, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, HUYGEN, and POSCH, *Appellate Military Judges.*

Senior Judge HUYGEN delivered the opinion of the court, in which Senior Judge JOHNSON and Judge POSCH joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

HUYGEN, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of three specifications of assault consummated by a battery and one specification of fraternization in violation of Articles 128 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 934.[1,2] The members adjudged a sentence of a dismissal and confinement for eight months. The convening authority approved the sentence as adjudged.

Appellant raises three assignments of error (AOE): (1) Appellant's convictions of three specifications of assault consummated by a battery are not legally and factually sufficient; (2) Appellant's conviction of fraternization is not legally and factually sufficient; and (3) the military judge erred by admitting improper evidence during sentencing.[3] We also considered the issue of timely appellate review. We find prejudicial error with regard to AOE (2) and thus set aside Appellant's conviction of fraternization and the sentence.[4]

## I. BACKGROUND

On the night of Friday, 18 March 2016, Appellant, a captain (O-3), and EC, then an airman first class (E-3),[5] stopped in several places to play pool and went to Playground, a nightclub in Tucson, Arizona. They left the club at approximately 0100 or 0200 hours on Saturday, 19 March 2016. EC was driving and Appellant was riding in the front passenger seat of EC's car. They

---

[1] For the three assault specifications, the members found Appellant not guilty of the excepted word "fist" (as in "strike in the face with his fist") but guilty of the substituted word "hand." The members also found Appellant not guilty of one specification of conduct unbecoming an officer and gentleman and one specification of communicating a threat in violation of Articles 133 and 134, UCMJ, 10 U.S.C. §§ 933, 934.

[2] All references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are to the UCMJ and rules found in the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[3] We do not address AOE (3) because of our resolution of AOE (2).

[4] The military judge failed to announce that the court-martial was assembled. *See* Rule for Courts-Martial (R.C.M.) 911 ("The military judge shall announce the assembly of the court-martial."). Assembly of the court is significant for a variety of reasons. *See* R.C.M. 911, Discussion. However, we find that the military judge's failure had no substantive effect on Appellant's trial and thus was harmless error.

[5] EC, a senior airman (E-4) at the time of Appellant's trial, was ordered to testify under a grant of immunity and listed as a prosecution witness but was actually called and testified as a defense witness.

tried to drive out of the parking lot, but a group of six to eight people stood in the way and would not move, even after EC flashed the car's headlights and honked the horn. The group included RD, JA, and VG.

RD, JA, VG, and several other friends had been drinking at Zen Rock, a nightclub near Playground. After leaving the club, they were walking through a parking lot when RD and JA stopped in front of EC's car. Appellant yelled at the two women that they were "hot" but "you bi[**]hes need to get the f[**]k out of the way." RD testified that she heard the word "bi[**]h," "got mad," and yelled back while JA tapped the hood of EC's car and also refused to move. Appellant got out of the car and EC followed Appellant to try to convince him to get back into the car. Both Appellant and EC appeared to be drunk according to AM, who was in the group with RD, JA, and VG.

Appellant got "in [RD's] face," and the two had what RD described as "a pretty heated argument" with each cursing at the other. Appellant said to RD, "I'm not afraid to slap a bi[**]h," and RD replied, "Oh yeah, you going to hit me? Then hit me then." Appellant then hit RD with his hand. JA testified that RD was knocked down but popped right back up and raised her hand to hit Appellant. But "before she even touched his face," Appellant hit RD a second time. As JA described it, "That's when I go into the scene and I'm like yelling at him, cursing at him. . . . And when I'm going towards him and he says, 'Oh, you want some of this too?'" AM testified that he was "holding back" JA when Appellant hit JA. VG saw Appellant hit RD and JA, ran towards her two friends, followed EC around the back of the car, and then, cursing and yelling, approached Appellant, at which point Appellant hit VG. As other people came closer, Appellant and EC got back into the car and drove away. AM called 911 and reported the incident to the Tucson Police Department. RD left before the police arrived, but JA and VG provided statements to the police and had their injuries photographed. Each of the women's faces had a reddened mark where she was apparently hit.

When Appellant testified at trial, he described the first physical contact of the confrontation as him being pushed in the chest by a Hispanic male, possibly AM. After more words were exchanged, Appellant thought that the group was walking away until one Hispanic female turned around and "everyone starts to charge me. . . . And two females shoved me and that is why I shoved them back." He did not remember a third female being involved. RD, JA, and VG were each described as a Hispanic woman less than five feet five inches in height but wearing high-heeled shoes on the night in question. Everyone in their group of six to eight people, including AM, was described as Hispanic. Appellant was described as a six foot two inch African American man and EC as a five foot ten inch Hispanic man.

Almost one month later, on the night of 16 April 2016, JA, VG, and two others were at Playground when JA saw Appellant and EC and recognized Appellant as her assailant. One of JA's companions contacted the police, who arrested Appellant when he walked out of the club.

## II. DISCUSSION

### A. Legal and Factual Sufficiency: Assault Consummated by Battery

Appellant first asserts that his convictions of three specifications of assault consummated by a battery are not legally and factually sufficient. Appellant points to (1) the contradictory and "false" statements of the three victims—RD, JA, and VG; (2) the evidence that RD used her status as a crime victim to try to get preferential treatment for a visa and that the victims' injuries were not consistent with their accounts; and (3) the evidence that Appellant acted in self-defense. Contrary to Appellant's assertion, we conclude the assault convictions are legally and factually sufficient.

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Id.* at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

In order for Appellant to be found guilty of assault consummated by a battery under Article 128, UCMJ, the Government was required to prove beyond a reasonable doubt that (1) Appellant did bodily harm to RD, JA, and VG by striking each in the face with his hand and (2) the bodily harm was done with unlawful force or violence. *See Manual for Courts-Martial, United States*

(2016 ed.) (*MCM*), pt. IV, ¶ 54.b.(2). An "assault" is done without legal justification or excuse and without the lawful consent of the victim. *Id*. ¶ 54.c.(1)(a). A "battery" is an assault in which the attempt to do bodily harm is consummated by the infliction of that harm. *Id*. ¶ 54.c.(2)(a).

Self-defense is a defense to assault consummated by a battery and requires that (1) Appellant had a reasonable belief that physical harm was about to be inflicted on him and (2) Appellant actually believed that the amount of force he used was required to protect himself. *See* Rule for Courts-Martial (R.C.M.) 916(e)(3). The right to self-defense is lost if Appellant was an aggressor, engaged in mutual combat, or provoked the attack that gave rise to the apprehension, unless Appellant had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred. R.C.M. 916(e)(4). Failure to retreat, when retreat is possible, does not deprive a person of the right to self-defense. R.C.M. 916(e)(4), Discussion. The availability of avenues of retreat is one factor that may be considered in addressing the reasonableness of a person's apprehension of bodily harm and the sincerity of the person's belief that the force used was necessary for self-protection. *Id*. The principles of self-defense apply to defense of another. R.C.M. 916(e)(5). The prosecution has the burden of proving beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1).

### 2. Analysis

Appellant argues that the weaknesses in the Government's case should lead us to conclude that the assault convictions are legally and factually insufficient. This argument fails to account for three key considerations.

First, with regard to the trial testimony of RD, JA, VG, and AM about the assaults, there was no significant contradiction. Instead, all the testimony was consistent that RD and JA prevented EC's car from exiting the parking lot, Appellant yelled and cursed at RD and JA, RD yelled back and JA tapped the hood of the car, and then Appellant got out of the car. Appellant and RD were in each other's "face" when Appellant warned RD he would hit her, RD acknowledged the warning, and Appellant hit RD. After Appellant hit RD a second time, he hit JA and VG in quick succession. We decline to interpret RD's acknowledgement ("Oh yeah, you going to hit me? Then hit me then.") of Appellant's warning ("I'm not afraid to slap a bi[**]h.") as RD's consent to being hit. We also decline Appellant's invitation to interpret his acquittal of the threat charge either as an affirmative finding that RD, JA, and VG were lying about Appellant communicating a threat and therefore lying about other matters or as anything more than the Government's failure to prove beyond a reasonable doubt that Appellant communicated a threat.

Second, we agree with Appellant that RD tried to use her status as a crime victim to get preferential treatment for a visa. However, we do not agree that the attempt undermined her credibility when she testified at trial about the basic facts of the assaults, especially because she did not remember Appellant hitting her the first time, which was described by JA, and she did not try to minimize the hostile nature of her actions or the fact that she was about to retaliate when Appellant hit her a second time. In addition, we find that the other witnesses' testimony about RD being hit and the photographic evidence of JA and VG's injuries were substantially consistent with the three victims' accounts as well as the court members' findings that Appellant hit each victim with his hand but did not punch any of them with his fist.

Third, we are convinced that Appellant did not act in self-defense when he hit RD, JA, or VG. Although RD and JA's refusal to move from in front of EC's car was obnoxious, Appellant was the first to engage when he yelled at them and called them "bi[**]hes." Even after he got out of the car, he could have regained the right to self-defense if he had withdrawn, *see United States v. Behenna*, 71 M.J. 228, 235 (C.A.A.F. 2012), but he did not withdraw. Although Appellant was not required to retreat, the totality of his actions, including his ignoring EC's entreaty to get back in the car, undercut his contention that he reasonably believed he was at risk of physical harm or that he actually believed he needed to hit RD, JA, or VG in order to protect himself or EC. There was also no evidence other than Appellant's own testimony that a group of six to eight people charged at him. We acknowledge Appellant's potential justification for hitting RD the second time when she raised her hand to retaliate,[6] as well as Appellant's position of being under verbal attack first by JA while she was held back by AM and then by VG after JA was hit. Nonetheless, we find Appellant's theory of self-defense failed.

Considering the evidence in the light most favorable to the prosecution, particularly the straightforward and consistent testimony about the assaults, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt and been convinced both that the Government proved beyond a reasonable doubt that the defense of self-defense did not exist and that Appellant was guilty beyond a reasonable doubt. After weighing the evidence in the record and making allowances for not having personally observed the witnesses, we are so convinced.

---

[6] *But see United States v. Wilhelm*, 36 M.J. 891, 893 (A.F. Ct. Crim. App. 1993) (quoting *United States v. O'Neal*, 36 C.M.R. 189, 193 (C.M.A. 1966)) ("Both parties to a mutual combat are wrongdoers, and the law of self-defense cannot be invoked by either, so long as he continues in the combat.").

**B. Legal and Factual Sufficiency: Fraternization**

Appellant next claims that his conviction of fraternization is not legally and factually sufficient and bases his claim on the Government's failure to prove beyond a reasonable doubt three elements of the offense.[7] We agree with regard to two elements, conclude the conviction is legally and factually insufficient, and set it aside.

**1. Additional Background**

The fraternization charge for violation of Article 134, UCMJ, read as follows:

> In that [Appellant] did, at or near Tucson, Arizona, on or about 19 March 2016, knowingly fraternize with Airman First Class [EC], an enlisted person, on terms of military equality, to wit: socializing in an off-duty setting, in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality, such conduct being to the prejudice of good order and discipline in the armed forces.

At Appellant's trial, AM testified that, in the parking lot on the night of 18–19 March 2016, Appellant and EC appeared "drunk." However, there was no evidence that either engaged in criminal conduct or inappropriate behavior while socializing in the hours before trying to drive out of the parking lot.

The Government requested judicial notice of the definition of fraternization in Air Force Guidance Memorandum 2017–01 to Air Force Instruction (AFI) 36–2909, *Professional and Unprofessional Relationships*, ¶ 2.2.1 (13 Mar. 2017). The civilian defense counsel and Appellant stated they had no concerns with such notice, which the military judge decided to take.

During the Government's case-in-chief, it called no witness specifically to address the fraternization charge or any of its elements. After the Government rested, the Defense moved to dismiss the charge pursuant to R.C.M. 917 and cited the lack of evidence of EC's enlisted status, custom of the Air Force, and conduct prejudicial to good order and discipline. The military judge ruled that there was "some evidence" of EC's enlisted status and denied the motion without addressing the issues of Air Force custom and prejudicial conduct.

---

[7] We do not address Appellant's contention regarding a "recklessness" *mens rea* for fraternization as we need not do so in order to resolve the assignment of error.

EC testified during the Defense's case-in-chief that Appellant and EC had been friends since high school when they took classes, worked out, and generally spent a lot of time together. EC described Appellant's mother as a second mother and Appellant as a brother. Appellant's mother in turn described EC as "a son to me . . . and my husband." Appellant testified that he was closer to EC than to his actual brother and sister. He and EC remained friends after Appellant, who was a grade ahead of EC, went to college. EC attended Appellant's college graduation and Air Force commissioning ceremony, and Appellant inspired EC to enlist in the Air Force. EC was assigned to Davis-Monthan Air Force Base, Arizona, three or four months before Appellant was assigned to the base in 2013. The assignment was Appellant's first non-training or operational assignment. He and EC were not in the same squadron or rating chain and had no contact with each other at work.

In accordance with the military judge's decision on judicial notice, he instructed the court members as follows:

> The "custom of the Air Force" with respect to fraternization as it existed at the time of the alleged offense is discussed in paragraph 2.2.1 of Air Force Instruction (AFI) 36-2909, Professional and Unprofessional Relationships, dated 1 May 1999. I have taken judicial notice of that particular provision, which includes the following definition of fraternization:

> Fraternization, as defined by the Manual for Courts-Martial, is a personal relationship between an officer and an enlisted member that violates the customary bounds of acceptable behavior in the Air Force and prejudices good order and discipline, discredits the armed services, or operates to the personal disgrace or dishonor of the officer involved. The custom recognizes that officers will not form personal relationships with enlisted members on terms of military equality, whether on or off-duty.

> Although the custom originated in an all-male military, it is gender neutral. Fraternization can occur between males, between females and between males and females. Because of the potential damage fraternization can do to morale, good order, discipline, and unit cohesion, the President specifically provided for the offense of fraternization in the Manual for Courts-Martial.

**2. Law**

The standard of review for legal and factual sufficiency is as stated above.

In order for Appellant to be found guilty of fraternization under Article 134, UCMJ, the Government was required to prove beyond a reasonable doubt that (1) Appellant was a commissioned officer; (2) on or about 19 March 2016, Appellant fraternized on terms of military equality with Airman First Class (A1C) EC by socializing in an off-duty setting; (3) Appellant knew A1C EC to be an enlisted member; (4) such fraternization violated the custom of the Air Force that officers shall not fraternize with enlisted members on terms of military equality; and (5) under the circumstances, Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See MCM*, pt. IV, ¶ 83.b.

> Not all contact or association between officers and enlisted persons is an offense. Whether the contact or association in question is an offense depends on the surrounding circumstances. The acts and circumstances must be such as to lead a reasonable person experienced in the problems of military leadership to conclude that the good order and discipline of the armed forces has been prejudiced by their tendency to compromise the respect of enlisted persons for the professionalism, integrity, and obligations of an officer.

*Id.* ¶ 83.c.(1).

### 3. Analysis

The military judge instructed the court members on the five elements of fraternization and the general explanation of fraternization we cite above. Appellant challenges on appeal whether the Government proved beyond a reasonable doubt elements (2), (4), and (5). We conclude that Appellant's conviction is legally and factually insufficient with respect to elements (2) and (4), that is, on 19 March 2016, Appellant fraternized by socializing with A1C EC in an off-duty setting and such fraternization violated a custom of the Air Force.

We begin our analysis by noting the dearth of cases dealing with officer-enlisted relationships that pre-date both members' military service; that do not implicate a superior-subordinate connection; or that do not involve sexual activity. *See, e.g., United States v. Wales*, 31 M.J. 301, 302 (C.M.A. 1990) ("Once again, we must review an officer's conviction for fraternizing with an enlisted person. Once again, the gravamen of the fraternization charge is that there was sexual intercourse between the two." (footnote omitted)). As a result, we are left to apply the "law" of fraternization to the singular facts of the fraternal relationship between Appellant and A1C EC, which pre-dated by more than five years their military service; did not implicate official duty,

much less a superior-subordinate connection; and certainly did not involve any sexual activity or even a hint of a romantic inclination.

We next turn to the charge the Government decided to prosecute and note its two most glaring weaknesses: (1) the charge was very specific to the night of 19 March 2016 and A1C EC[8] and (2) the charge was very general about the criminal conduct at issue being "socializing in an off-duty setting."[9] We also note that the Government requested and the military judge agreed to take judicial notice of AFI 36–2909 for the very limited purpose of a definition of fraternization. We paraphrase that definition—a personal relationship is fraternization if it violates a custom of the Air Force and it violates a custom of the Air Force if it is fraternization—and find it to be singularly uninstructive.[10]

In *Wales*, the Court of Military Appeals (CMA), the predecessor to the United States Court of Appeals for the Armed Forces, was "troubled that a 'custom' which is the basis for trying appellant for a crime authorizing the punishment of dismissal and 2 years' confinement was to be proved at trial by nothing more than a general statement in a nonpunitive regulation." 31 M.J. at 309. The CMA went on to question whether judicial notice of such a statement was proper and concluded:

> [I]f the Government wishes to prosecute fraternization on the basis of a custom in the military service, testimony must be offered by a knowledgeable witness—subject to cross-examination—about that custom. To require less is to allow the factfinder to make a determination that the custom exists without any indication on the record as to what that custom is.

---

[8] A1C EC indicated that a second enlisted member participated in the initial social activity the night of 18–19 March 2016, but that member was never identified, did not go to Playground with A1C EC and Appellant, and was not present in the parking lot for the confrontation.

[9] In motions practice during the presentencing proceeding, the Government made clear that the conduct "underlying the fraternization is socializing. . . . [T]he fraternization charge does not include any language that might suggest [the court members] were to use the assault of the three young women that night to [convict Appellant of fraternization]. It was merely socializing."

[10] We recognize that AFI 36–2909 is, in part, a punitive regulation, but the military judge did not take notice of its punitive provisions, and Appellant was not charged with a violation of the regulation under Article 92, UCMJ, 10 U.S.C. § 892.

*Id.*; *see also United States v. Appel*, 31 M.J. 314, 320 (C.M.A. 1990) ("[A] custom is not a subject for judicial notice . . . . With respect to the Air Force custom against fraternization . . . no one can say . . . that the extent of this custom is so clear as to dispense with the requirement of proof.").

Both Appellant and the Government in their respective briefs discussed *United States v. Fox*, 34 M.J. 99 (C.M.A. 1992). While our reading of the case does not strictly align with that of either party, we apply *Fox* to determine the factual and legal insufficiency of Appellant's fraternization conviction. In particular, we find applicable the CMA's continuation in *Fox* of its reasoning in *Wales*: "The Manual lists violation of 'custom' as an element of the offense. Likewise, a violation of 'custom' is alleged in the specification. The failure of the Government to prove adequately what the Air Force 'custom' was precludes us from upholding the findings of guilty as to fraternization." *Fox*, 34 M.J. at 103.

During Appellant's trial, the Government, in the entirety of its findings case-in-chief, called no military witness. Unsurprisingly, none of its civilian witnesses addressed any of the elements of the uniquely military offense of fraternization. As noted by Appellant in his brief, the Defense brought to the attention of the military judge the absence of evidence, including of custom of the Air Force, by moving for dismissal of the fraternization charge pursuant to R.C.M. 917. While the military judge addressed the evidence of A1C EC's enlisted status, the military judge did not address the evidence—or lack thereof—of Air Force custom or prejudicial conduct. We do here: the Government presented no evidence of custom of the Air Force, particularly with respect to officers and enlisted members socializing in an off-duty setting. *Cf. United States v. McCreight*, 43 M.J. 483, 485 (C.A.A.F. 1996) (noting "[t]here are appropriate circumstances for officers and their enlisted subordinates to socialize" but affirming first lieutenant's conviction for fraternization with a senior airman where the lieutenant was the airman's supervisor; the lieutenant "showed partiality and preferential treatment" to the airman at work; the two often socialized together in private and public settings while off-duty; and three government witnesses testified about the custom of the Air Force). *See also* AFI 36–2909, ¶ 3.4 ("It is often the frequency of [shared] activities . . . . which causes them to become, or to be perceived to be, unprofessional. While an occasional . . . activity between a supervisor and a subordinate could remain professional, daily or weekly activities could result at a minimum in the perception of an unprofessional relationship.").

As the CMA found in *Wales*, we find in Appellant's case that the Government "did not adequately discharge its burden of proving the nature of the custom on which it relied to convict" Appellant for fraternization under Article 134, UCMJ. *See Wales*, 31 M.J. at 309. The Government failed to intro-

duce evidence that would enable a reasonable factfinder to have found all the essential elements of the offense as it was charged, and we are not convinced of Appellant's guilt. Therefore, we conclude Appellant's conviction for fraternization is legally and factually insufficient, and we set it aside.

### 4. Sentence Rehearing

Because we set aside the findings of guilty of fraternization, or Specification 2 of Charge III and Charge III, we consider whether we can reassess the sentence. We have "broad discretion" first to decide whether to reassess a sentence and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). To determine whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances, including the following illustrative, non-exhaustive factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id*. at 15–16 (citations omitted).

Noting Appellant's request for the specific relief of sentence reassessment, we have considered the totality of the circumstances and decide to authorize a sentence rehearing. By setting aside the fraternization conviction, we are setting aside the more serious charge of which Appellant was convicted and thereby reducing his penalty exposure from 42 months of confinement to 18. In addition, Appellant chose trial and sentencing by members, a factor of forum selection made "more relevant" because the charge we set aside involves custom of the Air Force and conduct prejudicial to good order and discipline. *See id*. at 16. We also considered that the remaining assault offenses do not capture the gravamen of criminal conduct originally charged.[11] Although the

---

[11] Because the gravamen of the original charges is not entirely captured in the assault offenses, the third *Winckelmann* factor weighs in favor of rehearing. While we do not determine "whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses," *see Winckelmann*, 73 M.J. at 16, we note the concerns raised by Appellant regarding the admission of the Personal Data Sheet, nonjudicial punishment action under Article 15, UCMJ, 10 U.S.C. § 815, letter of reprimand, and unfavorable information file as prosecution exhibits for sentencing.

remaining offenses of assault consummated by a battery are of the type with which we are experienced and familiar, the other *Winckelmann* factors prevent us from reliably determining in Appellant's case "what sentence would have been imposed at trial." *See id.* Therefore, we authorize a rehearing.

## C. Timeliness of Appellate Review

We review de novo whether an appellant has been denied the due process right to a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted).

Appellant's case was originally docketed with the court on 26 October 2017. The delay in rendering this decision by 26 April 2019 is presumptively unreasonable. However, we determine no violation of Appellant's right to due process and a speedy post-trial review and appeal.

The delay in this case exceeded the *Moreno* standard by two weeks. The reasons for the delay include the time required for Appellant to file his brief on 22 August 2018 and the Government to file its answer on 21 September 2018. Appellant has not asserted his right to speedy appellate review. Appellant began his eight months of confinement on 24 June 2017 and was released at least six months before his brief was filed. Appellant makes no claim of prejudice—whether oppressive incarceration, anxiety and concern, or impaired appeal or defenses, *see id.* at 138–39—as a result of the delay for the court to complete appellate review of his case. We find none.

Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). As a result, there is no due process violation. *See id.* In addition, we determine that relief is not warranted in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002); *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

## III. CONCLUSION

The findings of guilt of Specification 2 of Charge III and Charge III are **SET ASIDE** and Specification 2 of Charge III and Charge III are **DIS-**

MISSED WITH PREJUDICE. The sentence is **SET ASIDE**. The case is returned to The Judge Advocate General for further processing consistent with this opinion. A rehearing on sentence is authorized. Article 66(e), UCMJ, 10 U.S.C. § 866(e).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court