**UNITED STATES, Appellee,**

v.

**Steven S. APPEL, Major, U.S. Air Force, Appellant.**

**No. 63,160.**
**ACM 27462.**

U.S. Court of Military Appeals.

Argued June 14, 1990.

Decided Sept. 28, 1990.

For Appellant: *Major Bernard E. Doyle, Jr.* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain David G. Nix* (argued); *Colonel Robert E. Giovagnoni* (on brief); *Colonel Joe R. Lamport, Lieutenant Colonel Barret E. Kean,* USAFR, and *Major Terry M. Petrie.*

*Opinion*

EVERETT, Chief Judge:

In July 1987, Major Appel, a reservist, was ordered to perform a short tour of active duty, during which he served as commander of a squadron participating in the Bright Star exercise in Egypt. One of the members of the same squadron was Senior Airman Sherry P. Rast. Appellant's conduct while in Egypt and in transit back to his home in Texas led to his conviction on a charge with three specifications alleging fraternization, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934, and on an Additional Charge of adultery, preferred under the same Article.[1]

The sentence adjudged was dismissal, a fine of $15,000, and a reprimand. The convening authority approved the sentence. The Court of Military Review in an unpublished opinion affirmed the findings and sentence except for reducing the fine to $5,000.

Appellant petitioned for review, which we granted on this issue:

> WHETHER THE AIR FORCE HAS FAILED TO SUFFICIENTLY ESTABLISH A CUSTOM AGAINST FRATERNIZATION SINCE *UNITED STATES V. JOHANNS* [20 M.J. 155 (CMA 1985) ] SO AS TO PLACE AN AIR FORCE RESERVIST ON SUFFICIENT NOTICE OF SAID CUSTOM SUCH THAT A VIOLATION MAY BE CRIMINALLY ENFORCEABLE UNDER THE UNIFORM CODE OF MILITARY JUSTICE.

We also specified this issue:

> WHETHER THE SPECIFICATIONS OF CHARGE II ALLEGE BUT ONE CONTINUING OFFENSE AND SHOULD BE COMBINED.[2]

I

The first fraternization specification[3] alleged that Major Appel did

> in the country of Egypt on divers occasions from on or about 31 July 1987 to on or about 21 August 1987, knowingly fraternize with Senior Airman Sherry P. Rast, a married enlisted person not his wife assigned to the same unit as the said Major Appel and under the supervision of said Major Appel, on terms of military equality, to wit: By holding hands, hugging, kissing, and showing other displays of affection with the said Senior Airman Rast, in violation of the custom of the United States Air Force

---

1. Appellant was also charged with the offense of making false official statements, in violation of Article 133 of the Uniform Code of Military Justice, 10 USC § 933. However, the military judge dismissed this charge on a defense motion after arraignment.

2. During oral argument, we raised a question whether the Government had established jurisdiction to try appellant for the charged offenses.

However, upon examination of the record and of the applicable regulations, we are convinced that jurisdiction was properly established. *Cf. Murphy v. Garrett,* 29 MJ 469 (CMA 1990).

3. Each specification alleged the offense was committed by appellant "while in active duty status."

that officers shall not fraternize with enlisted persons on terms of military equality.

According to the second specification,[3] appellant

did, in Madrid, Spain, from on or about 21 August 1987 to on or about 22 August 1987, knowingly fraternize with Senior Airman Sherry P. Rast, a married enlisted person not his wife assigned to the same unit as the said Major Appel and the supervision of the said Major Appel, on terms of military equality, to wit: by sharing a hotel room with the said Senior Airman Rast, in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality.

The third specification[3] alleged that appellant,

did, at Myrtle Beach Air Force Base, South Carolina, from on or about 23 August 1987 to on or about 24 August 1987, knowingly fraternize with Senior Airman Sherry P. Rast, a married enlisted person not his wife, on terms of military equality, to wit: by sharing a billeting room with the said Senior Airman Rast, who was assigned to the 354 Services Squadron which organization was responsible for the operation of the billeting function at Myrtle Beach Air Force Base, South Carolina, in violation of the custom of the United states Air Force that officers shall not fraternize with enlisted persons on terms of military equality.

The allegations[3] of adultery, contained in the Additional Charge, were that appellant,

a married man, ... while in active duty status, did in the country of Egypt, in or near Madrid, Spain, and at Myrtle Beach Air Force Base, South Carolina, on divers occasions, between on or about 31 July 1987 and on or about 24 August 1987, wrongfully have sexual intercourse with Senior Airman Sherry P. Rast, a married woman not his wife.

After arraignment, the defense moved that the military judge dismiss the fraternization charge and its three specifications "for failure to state an offense." Also, the defense filed a motion to consolidate the three specifications of fraternization. On the motion to dismiss, the Government offered evidence that, when the 354th Services Squadron at Myrtle Beach Air Force Base had deployed to Egypt in July 1987 for the Bright Star Exercise, Major Appel had commanded the unit and Senior Airman Sherry Rast had been a member of the squadron. Subsequently, on August 21, 1987, they both had departed Egypt on the same aircraft on their way to the United States. The plane stopped in Madrid overnight. The next day, Appel and Rast flew back to Dover, Delaware; and ultimately they reached Myrtle Beach Air Force Base, where appellant and Senior Airman Rast spent the night together in his room at the visiting officers quarters.

Trial counsel contended that, even after *United States v. Johanns*, 17 MJ 862 (AFCMR 1983), *aff'd*, 20 MJ 155 (CMA), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985), the offense of fraternization could be committed "between an officer and a subordinate, when you have a command supervisory relationship." Defense counsel replied that, although fraternization which involves sexual activity might be prosecutable, here none of those specifications alleged sexual intercourse. Instead, the fraternization consisted of "holding hands, hugging, kissing, and showing other displays of affection"; "sharing a hotel room"; and "sharing a billeting room." Moreover, the defense asserted that, once Major Appel left Egypt, he was no longer Senior Airman Rast's commander.

The military judge suggested the possibility "that if a relationship arose while they were commander and subordinate, the effect of that might carry over even after that relationship was formally terminated." At one point in the discussion, the judge conceded that "were we trying this case immediately after the *Johanns* decision, I would have to rule in [the defense's] favor." Ultimately, the military judge denied the motion to dismiss and stated that he

would probably make some "findings which I would attach as an appellate exhibit." He also rejected the motion to consolidate the three fraternization specifications. Thereafter the defense elected trial by military judge alone.[4]

Appellant pleaded guilty to the three specifications of fraternization and, except for the words "in the country of Egypt," pleaded guilty to the specification alleging adultery. The military judge then conducted a careful inquiry into the providence of the pleas; and, as part of that inquiry, he provided the defense a five-page, single-spaced discussion of the elements of wrongful fraternization and adultery and the related definitions.[5] The judge carefully explained the elements of the offenses; and, in that connection, he pointed out the fraternization offenses

> required that the enlisted member be subordinate in assignment, plus there must be a duty relationship which regularly or recurringly calls for or may call for direction, oversight, correction or evaluation of the enlisted member by the officer. It is not required that there be a formal supervisory or command relationship between the two, even though in this case that is in fact what is alleged.

Major Appel answered in the affirmative when the military judge asked whether he believed "that the elements when construed along with those definitions accurately and fairly described the misconduct alleged."

Defense counsel expressed disagreement with a reference by the military judge to paragraph 7a of Air Force Regulation (AFR) 30–1, Personnel–Air Force Standards, dated May 4, 1983, which states in part:

> There is a long standing and well recognized custom in the military service that officers shall not fraternize or associate with enlisted members under circumstances that prejudice the good order and discipline of the Armed Forces of the United States.[6]

Defense counsel noted that *United States v. Johanns, supra,* "seems to explicitly revoke the language of this regulation that there's this long standing and well recognized custom in existence, and there hasn't been amendments or changes or reaffirmations to that regulation post *Johanns.*" The military judge, however, took the position that, in *Johanns* and later cases, the existence of a custom was recognized and the only question was "to what extent and what portions of the custom are enforceable at a court-martial."[7]

During the providence inquiry, Major Appel testified that, while deployed in Egypt, he had developed a friendship with Senior Airman Rast, which grew out of their conversations and "probably on several occasions, possibly returning from a night movie which was some kind of amusement that we had over there, we were seen holding hands, walking arm in arm, hugging, as it were. And on several occasions, I kissed her, because that friendship had turned

---

4. The defense had unsuccessfully moved that reservists be appointed to serve as members on the court-martial. In electing trial by military judge alone, the defense counsel stated that if this motion had been granted, the defense "election as to forum would have been different." The judge pointed out the possibility that an appellate court "would say that in going with judge alone you have in effect waived that motion"; but the accused still elected trial by judge alone.

5. The military judge in this case was Colonel J. Jeremiah Mahoney who recently has written a scholarly and incisive article on fraternization. *See Fraternization: Military Anachronism or Leadership Challenge?,* 28 A.F. L.Rev. 153 (1988).

6. The military judge had quoted this language in his written explanation of the elements and related definitions, which he had furnished the defense at the beginning of the providence inquiry.

7. The military judge also commented that, when he had tried *United States v. Haye,* 29 MJ 213 (CMA 1989), he had judicially noted the quoted section of AFR 30–1 "and let the court members consider that as evidence of the existence of the custom." He then mentioned that, when the *Haye* case was reviewed on appeal, there had been no discussion about his taking judicial notice of the regulation.

into a much deeper kind of involvement." According to appellant, the displays of affection in Egypt had occurred "after the duty day ended"; and they "were walking around in shorts and T-shirts, and just to kind of relax." Although "we definitely didn't try to flaunt it," appellant could "imagine ... some others did see us." Later, in response to a question by the military judge, appellant conceded that it was "quite possible" that "either one or both of" them had been in uniform.

Because of an illness and death in his family, appellant was sent home from Egypt ahead of schedule, and Rast and others were on the same flight. They stayed overnight in Madrid; and Rast spent the night in his room. Then, when he arrived at Mrytle Beach, he obtained a room in the visiting officers quarters, where he was contacted ·by Rast. "We talked at length, and I decided that, just based on conversation, that she should stay with me that night. She did. And in Madrid, and Myrtle Beach we—we made love."

Appellant also admitted that when they were in Madrid, "whether or not it was formally defined somewhere," he was "treated as being the senior and thus, Airman Rast would have been the subordinate in that limited sense." After arrival at Myrtle Beach, Rast "had returned to her permanent unit of assignment"; and appellant was "essentially still enroute awaiting transportation back to [his residence in Texas] to terminate [his] active duty tour."

Before the military judge entered findings, the Government offered some witnesses as to the circumstances of the alleged offenses. An Air Force Staff Sergeant with 6 years' experience stated that what she "saw between Major Appel and SrA Rast ... was unprofessional." Another witness. thought the relationship between appellant and Airman Rast that he observed was "unethical as far as the Air Force," because the Standards of Conduct are "that enlisted and officers are not supposed to fraternize, and from what I remember, even more so when the individual is in the chain of command."

A senior airman who had been in Egypt and had observed Major Appel with Airman Rast believed that the couple's conduct had not been correct because

> [g]ood order and discipline, just from everything I've been taught since I've been in the military, cannot exist if you have fraternization between officers and enlisted people in the same chain of command, or in any occasion, really. I know it caused a lot of hard feelings with other people from the services squadron. They were kind of grumbling about it.

At the end of the Government's case, the military judge took judicial notice of AFR 30–1.[8]

## II

### A

Appellant was convicted of violating an Air Force custom that prohibits fraternization between officers and enlisted persons. Prosecutions based on custom are today unknown in the Federal District Courts

---

8. Meanwhile, the military judge had entered findings on his denial of the motion to dismiss the fraternization offenses. Among the findings were these:

1. There still exists a criminally enforceable custom against fraternization in the Air Force. *United States v. Johanns*, 20 M.J. 155 (CMA 1985); *United States v. Johanns*, 17 M.J. 862 (AFCMR 1983). Excluded from that criminally enforceable custom is fraternization involving "mutually voluntary, private, non-deviate sexual intercourse," where the enlisted member is not under the command or supervision of the officer. *Id.* at 869. *See also U.S. v. Caldwell*, 23 M.J. 748 (AFCMR 1987).

2. With that limited exception, fraternization with an enlisted member by an officer is subject to criminal sanction if the fact finder(s) conclude it is in violation of Air Force custom, and that it is prejudicial to good order and discipline, or that it is service discrediting.

3. With respect to the notice requirement, "the existence of such a custom would provide notice to officers, so that they would have no reasonable doubt as to the legal requirements to which they are subject." *United States v. Johanns*, 20 M.J. 155, 160 (CMA 1985).

and, if they even exist in State courts, are relatively infrequent there.[9] Perhaps the closest parallel today would be to prosecutions in tribal courts. *Cf. Duro v. Reina,* 495 U.S. ——, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990).

The Supreme Court, however, "has long recognized that the military is, by necessity, a specialized society separate from civilian society" and "that the military has, again by necessity, developed laws and traditions of its own during its long history." *See Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439, 450–51 (1974). Moreover, in *Parker v. Levy,* where Dr. Levy had attacked his convictions under Articles 133 and 134 of the Uniform Code because of the claimed vagueness of these punitive articles, the Supreme Court pointed out:

> Decisions of this Court during the last century have recognized that the longstanding customs and usages of the services impart accepted meaning to the seemingly imprecise standards of Arts 133 and 134. In *Dynes v. Hoover,* 20 How 65, 15 L.Ed. 838 (1857), this Court upheld the Navy's general article, which provided that "[a]ll crimes committed by persons belonging to the navy, which are not specified in the foregoing articles, shall be punished according to the laws and customs in such cases at sea." The Court reasoned:
>
> > "[W]hen offences and crimes are not given in terms or by definition, the want of it may be supplied by a comprehensive enactment, such as the 32d article of the rules for the government of the navy, which means that courts martial have jurisdiction of such crimes as are not specified, but which have been recognized to be crimes and offences by the usages in the navy of all nations, and that they shall be punished according to the laws and customs of the sea. Notwithstanding the apparent indeterminateness of such a

provision, it is not liable to abuse; for what those crimes are, and how they are to be punished, is well known by practical men in the navy and army, and by those who have studied the law of courts martial, and the offences of which the different courts martial, have cognizance."

417 U.S. at 746–47, 94 S.Ct. at 2557, 41 L.Ed.2d at 452–53.

The Supreme Court also noted that the interpretation of Articles 133 and 134

> by the Court of Military Appeals and by other military authorities ... has narrowed the very broad reach of the literal language of [Articles 133 and 134], and at the same time has supplied considerable specificity by way of examples of the conduct which they cover. It would be idle to pretend that there are not areas within the general confines of the articles' language which have been left vague despite these narrowing constructions. But even though sizable areas of uncertainty as to the coverage of the articles may remain after their official interpretation by authoritative military sources, further content may be supplied even in these areas by less formalized custom and usage. *Dynes v. Hoover,* 20 How. 65, 15 L.Ed. 838 (1957). And there also cannot be the slightest doubt under the military precedents that there is a substantial range of conduct to which both articles clearly apply without vagueness or imprecision.

417 U.S. at 754, 94 S.Ct. at 2560–61, 41 L.Ed.2d at 456–57. The Court then concluded that, under all the circumstance, Dr. Levy had "fair notice from the language of each article that the particular conduct which he engaged in was punishable." 417 U.S. at 755, 94 S.Ct. at 2561, 41 L.Ed.2d at 457.

■ Although we interpret *Parker v. Levy, supra,* to permit a trial by court-martial predicated on violation of a military custom, we do not believe it means that the

---

**9.** Some states recognize common law crimes which probably originated centuries ago in English custom.

Government is free to prosecute without proof of that custom. Indeed, to allow a servicemember to be convicted on the basis of a custom without requiring that its existence and nature be established at trial would deprive him of the appellate rights granted by the Uniform Code of Military Justice.

How could a Court of Military Review or this Court be sure that the conduct established by the evidence really violated the custom if the record does not show what the custom is? A custom is not itself a statute or a regulation having the force of law. Indeed, the Manual for Courts–Martial distinguishes between statutes and regulations on the one hand and customs on the other. *See* para. 60, Part IV, Manual for Courts–Martial, United States, 1984.

■ Thus, a custom is not a subject for judicial notice under Mil.R.Evid. 201A, Manual, *supra.* Instead it must satisfy Mil.R. Evid. 201(b), whereunder "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known universally, locally, or in the area pertinent to the event or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

With respect to the Air Force custom against fraternization, which Major Appel was charged with violating, no one can say in light of *Johanns* that the extent of this custom is so clear as to dispense with the requirement of proof. Certainly, it would be surprising if there had been no change in the customs concerning relationships between male and female members of the armed services, regardless of their rank, as a result of the recent dramatic increase in the number and percentage of females in the armed services. Indeed, some critics have complained that women should not be used extensively in the armed services because their very presence tends to destroy some of the traditions and customs on

which a successful military establishment is based. *Cf.* Brian Mitchell, *The Weak Link* (Regnery Gateway Pubishers 1989).

The opinion of the Air Force Court of Military Review in *United States v. Johanns, supra,* makes clear that, at least in that service, there have been some dramatic changes in policy which, in some respects, are inconsistent with some preexisting Air Force customs. As Judge Mahoney—who tried this case—has made clear in a recent article, to restore fully all the former distinctions between Air Force officers and enlisted persons will require that service to take some action that has not yet been taken.[10]

■ *Parker v. Levy, supra,* certainly never intended that members of the armed services be punished for conduct which they could not reasonably know was a crime. The requirement that adequate notice be given of what conduct is criminal applies in both civilian and military prosecutions. *See, e.g., United States v. Tolkach,* 14 MJ 239 (CMA 1982). With this in mind, this Court has suggested on two prior occasions that, in dealing with fraternization, the armed services might profitably consider issuing punitive regulations to define some relationships which are especially harmful to military discipline. *See United States v. Johanns, supra; United States v. Pitisi,* 20 USCMA 601, 44 CMR 31 (1971). However, the Air Force apparently has not yet perceived a necessity to issue such regulations; and it continues to rely on Air Force custom in prosecuting fraternization.[11] Having made this choice, the Air Force must accept as a consequence the obligation to establish by proof at trial the existence and notice of the custom that has been violated. *See also United States v. Wales,* 31 MJ 301 (CMA 1990).

■ We reject, however, a defense contention that, as a reservist, Major Appel should not be charged with the same notice

---

**10.** See article cited in n. 5, *supra* at 193.

**11.** In April 1990 the Air Force promulgated a non-punitive regulation concerning fraterniza-

tion. *See United States v. Wales,* 31 MJ 301 (CMA 1990).

of Air Force custom as active-duty members. Certainly in this era of a "Total Force," reservists who are called to active duty are expected to maintain the same standards of conduct as those serving in the regular component. Moreover, it seems clear that all the armed services have engaged in extensive training to assure that reservists are familiarized with this responsibility. Thus, we decline to create any special exception for reservists on the grounds that they have less knowledge of custom.[12]

**B**

■ In the present case, the Government's evidence was that appellant's association with Airman Rast was not "professional" and was "unethical." Such evidence may be appropriate in sentencing or in an administrative proceeding to demote or separate a servicemember. However, it does not establish the existence of a custom whose breach authorizes dismissal, 2 years' confinement, and total forfeitures.

Fortunately for the Government, appellant pleaded guilty and, during a careful providency inquiry, admitted the existence of the various elements of the offense, as outlined in detail by the military judge. Our concern is whether, despite this inquiry, the guilty pleas must be considered improvident in light of the rulings that preceded it. In short, we must ask whether the undisputed facts are sufficient to establish the violation of an Air Force custom against fraternization.

■ With respect to the specification alleging fraternization at Myrtle Beach, we are unable to reach this conclusion. The properly alleged premise of the fraternization charge was that Senior Airman Rast was a military subordinate of Major Appel. However, after appellant had reached Myrtle Beach in transit back to his home in

Texas, we conclude that this relationship had ended. On the other hand, while Major Appel and Airman Rast were in Madrid, there was a basis for inferring that he was still in a command or supervisory relationship with her—especially in light of appellant's guilty plea.

■ In Egypt, clearly he was her commander; and it is not implausible that the conduct which he admitted violated a military custom, even though no sexual intercourse there was admitted or proven. Again in view of his plea of guilty, we believe the finding of guilty on this specification can be upheld.

**C**

■ The fraternization here involved a continuous course of conduct. Although the venue changed from an Egyptian desert to downtown Madrid, we do not consider this significant when there was no appreciable interval of time and where fraternization between the same individual was involved. *See generally United States v. Sturdivant*, 13 MJ 323 (CMA 1982). In fraternization cases, we do not believe that each kiss, hug, or even each act of sexual intercourse between an officer and an enlisted person which occurs in violation of military custom should be treated as a separate offense either for findings or sentence. Otherwise a few weeks of fraternization would authorize punishments equal to those for the most serious felonies. Thus, we conclude that here the military judge erred in treating the three fraternization specifications as separate both for findings and sentence.

**III**

**DECISION**

Specifications 1 and 2 of Charge II are consolidated as specification 1 of Charge II as follows:

---

12. Among Judge Mahoney's findings on the defense motion to dismiss were these:

4. As to the effect of accused's status as a Category B reservist, the Court was provided no evidence to substantiate the defense claim that such reservists lack adequate notice of Air Force customs. Specifically, no deficiencies in training or education were shown, and there was no evidence offered tending to establish that reservists would not be aware of Air Force customs during their tours of active duty.

5. The court finds no basis in law or fact to hold reserve officers to a lesser standard of officership than is demanded of their regular component counterparts.

In that MAJOR STEVEN S. APPEL, United States Air Force, 56th Services Squadron, while in active duty status, did, in the country of Egypt on divers occasions from on or about 31 July 1987 to on or about 21 August 1987, knowingly fraternize with Senior Airman Sherry P. Rast, a married enlisted person not his wife assigned to the same unit as the said Major Appel and under the supervision of the said Major Appel, on terms of military equality, to wit: By holding hands, hugging, kissing, and showing other displays of affection with the said Senior Airman Rast, and in Madrid, Spain, from on or about 21 August 1987 to on or about 22 August 1987, by sharing a hotel room with the said Senior Airman Rast, in violation of the custom of the United States Air Force that officers shall not fraternize with enlisted persons on terms of military equality.

The decision of the United States Air Force Court of Military Review is reversed as to specification 3 of Charge II and the sentence. The finding of guilty thereon is set aside, and that specification is dismissed. The decision below is affirmed as to specification 1 (consolidated) of Charge II and the Additional Charge and its specification. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court which may set aside the sentence and order a rehearing on sentence, or reassess the sentence based on the affirmed findings of guilty.

SULLIVAN, Judge (concurring in part and in the result):

I join the lead opinion to the extent of its guilty-plea analysis. Because I find this point determinative, I need not comment on other aspects of the lead opinion.

COX, Judge (dissenting in part and concurring in the result):

I adhere to my position as expressed in *United States v. Wales*, 31 MJ 301 (CMA 1990).