## UNITED STATES

### v.

**Second Lieutenant Ronnie D. BOYETT, 422–15–4849, United States Air Force.**

**ACM 29345.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 29 April 1991.

Decided 2 July 1993.

Appellate Counsel for the Appellant: Lieutenant Colonel Frank J. Spinner (argued), Colonel Jeffrey R. Owens, Colonel Terry J. Woodhouse, and Captain Ursula P. Moul.

Appellate Counsel for the United States: Major Paul H. Blackwell, Jr. (argued), Colonel Richard L. Purdon, Lieutenant Colonel Brenda J. Hollis, and Lieutenant Colonel Jeffery T. Infelise.

Before DIXON, O'HAIR, LEONARD,* McLAUTHLIN,* SNYDER, JAMES, JOHNSON, GRUNICK, and HEIMBURG, Appellate Military Judges, En Banc.

## OPINION OF THE COURT

HEIMBURG, Judge:

Lieutenant Boyett pleaded guilty to four specifications of conduct unbecoming an officer,[1] one of which (specification 5) alleged an "unprofessional close and personal social relationship" with an enlisted member who was neither his subordinate nor a member of his unit.[2] He appeals, arguing specification 5 fails to state an offense in light of this Court's *Johanns* decision.

In *United States v. Johanns,* this Court held "as a matter of fact and law the custom against fraternization [in the Air Force] has been so eroded as to make *criminal prosecution* against an officer for engaging in mutually voluntary, private, nondeviate sexual intercourse with an enlisted

---

* Senior Judges LEONARD and McLAUTHLIN participated in this decision before their departure from the court.

1. In violation of Article 133, UCMJ, 10 U.S.C. § 933 (1988): "Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."

2. Before a military judge sitting as a general court-martial, Lieutenant Boyett also pleaded guilty to making a false official statement to the officer who conducted the initial investigation of the allegations which resulted in these charges, having sexual intercourse with a female airman who worked for him, and making an obscene and demeaning declaration about that airman in the presence of two other subordinates. *His approved sentence is dismissal from the service and forfeiture of $500 pay per month for 3 months.*

member, neither under his command nor supervision, unavailable." 17 M.J. 862, 869 (A.F.C.M.R.1983). Today, we address whether a guilty plea to conduct clearly not recognized as criminally prosecutable fraternization under the holding in *Johanns* may stand. We limit the findings of *Johanns* to the facts of that case and affirm Lieutenant Boyett's guilty plea.

## BACKGROUND

Article 133, UCMJ, proscribes "conduct unbecoming an officer and a gentleman." On its face, this historic[3] article does not mention "custom" and seems to have nothing whatever to do with the punishment of violations of "custom." What, then, is the significance of the reference to "the custom against fraternization" by the *Johanns* majority? For the answer, we turn to the Supreme Court case which upheld Article 133 against claims that it violated the Due Process clause of the Fifth Amendment, as "void for vagueness" and "overbroad."

In *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), Article 133 was attacked as too vague to sustain criminal sanctions. In upholding its constitutionality, the Supreme Court observed that decisions of the Court of Military Appeals, precedents incorporated over the years into manuals for courts-martial, and generally recognized customs of military service have had the effect of both narrowing the "very broad reach" of the article and supplying "considerable specificity by way of examples of the conduct which they cover." *Parker v. Levy*, 417 U.S. at 754, 94 S.Ct. at 2561. As for the "sizable areas of uncertainty" which remain after resort to such sources of "official interpretation by authoritative sources, further content may be supplied ... by less formalized custom and usage." *Id.*

At least since *Parker v. Levy*, then, it is clear that specifications under Article 133 may be sustained against "due process" attack only if they are defined by military precedent, but that precedent can include the common law of historic military traditions and customs. This is where the existence of a "custom of the service" becomes relevant: it is one means of giving officers notice of the legal limits imposed by their military status on otherwise permissible behavior, thus meeting the due process requirements of the Constitution.[4] Customs of the service help to define behavior which is "unbecoming an officer and gentleman," "prejudicial to good order and discipline," or "of a nature to bring discredit upon the armed forces," under Articles 133 and 134, UCMJ.

## UNITED STATES v. JOHANNS

In *Johanns*, a majority of this Court found "as a matter of fact and law the custom of the Air Force against fraternization has been so eroded as to make *criminal prosecution* against an officer for engaging in mutually voluntary, private, nondeviate sexual intercourse with an enlisted member, neither under his command nor supervision, unavailable." 17 M.J. at 869 (emphasis in original). This statement, although termed a finding "of fact and law," actually amounted to a finding of fact, coupled with a legal conclusion. The finding of fact was that the "custom in the Air Force against fraternization" had been "eroded." The *Johanns* majority found this erosion wore away the part of the Air Force custom against fraternization which prohibited sexual intercourse between officers and enlisted members where no other prohibitions, e.g., deviancy or a supervisory relationship, were present. The legal conclusion was that, to the extent the custom was eroded, it was not enforceable by criminal sanctions.

---

**3.** A predecessor of this article was included in the British Articles of War of 1765, in effect at the beginning of the Revolutionary War, and in American military codes of 1775, 1776, and 1786. W. Winthrop, MILITARY LAW AND PRECEDENTS 945, 957, 969, and 974 (2d. ed.,

1920 reprint). It was revised in 1806 to substantially its present form. Winthrop, *supra* at 710, 983.

**4.** *See, e.g., United States v. Parrillo*, 31 M.J. 886, 890–91 (A.F.C.M.R.1990).

The Court of Military Appeals deferred to this Court's fact-finding powers under Article 66(c), UCMJ. 20 M.J. 155, 160–61 (C.M.A.1985). It observed, "it appears that Captain Johanns lacked the notice from custom or otherwise which, even under the relaxed standard of review established by *Parker v. Levy, supra,* is constitutionally necessary to meet the due-process requirements of the fifth amendment." *Id.* at 161. Acting on the finding *of fact* of the *Johanns* majority that the Air Force custom against fraternization was "eroded," the Court of Military Appeals decided Captain Johanns "lacked constitutionally required notice" of the criminality of his behavior under *Parker v. Levy* and affirmed the dismissal of the affected specifications. *Id.* at 158.

The *Johanns* majority's finding of fact, apparently because it was not expressly limited to the record in that case, has long been considered *prima facie* evidence of the general state of Air Force customs on fraternization. So long as *Johanns* announced the state of Air Force customs as a matter of fact, no prosecution outside the narrow limits outlined in that opinion could survive constitutional scrutiny. As a result, the finding set the legal framework for subsequent Air Force cases involving similar behavior.[5] Although in recent years Chief Judge Everett observed that a finding of fact contrary to the finding made in the *Johanns* decision would lead to a different legal result, no contrary finding has been made. *See United States v. Appel,* 31 M.J. at 320; *United States v. Wales,* 31 M.J. at 308–09.[6]

## THE GUILTY PLEA

We now turn to the facts of this case. Lieutenant Boyett, before entering his pleas, moved to dismiss specification 5 for failure to state an offense. The trial judge determined he could not rule on the motion without hearing evidence, because there was a factual issue to be resolved: whether, because of a custom of the service or otherwise, Lieutenant Boyett "was on fair notice of the criminality of his conduct." The prosecutor suggested, since it was a bench trial, the judge could defer ruling until the presentation of evidence. Although trial defense counsel argued that the issue was solely one of law, she did not object to deferring the ruling. Pursuant to a pretrial plea agreement, Lieutenant Boyett then entered a plea of guilty to the contested specification.

During the providence inquiry, Lieutenant Boyett testified he was a product of the Air Force Reserve Officers Training Corps (ROTC) program. His ROTC instructors taught him it was improper for an officer to have a close personal relationship with enlisted members generally, not just those who work directly for the officer. After coming on active duty, he had that notion reinforced by active duty officers and NCOs. His first squadron commander held two conversations with Lieutenant Boyett on the subject of officer-enlisted relationships. The first conversation was held within two or three months after Lieutenant Boyett arrived at the squadron, after duty hours. While he described it as "just a talk," Lieutenant Boyett told the judge there was apparently "some concern" in the squadron he was "too friendly" with airmen, male and female, and the com-

---

**5.** For illustration of how this finding has affected Court of Military Appeals treatment of Air Force cases, *see United States v. Fox,* 34 M.J. 99 (C.M.A.1992); *United States v. Appel,* 31 M.J. 314 (C.M.A.1990); *United States v. Wales,* 31 M.J. 301 (C.M.A.1990). Its impact on Air Force decisions can be seen in these cases: *United States v. Miller,* 34 M.J. 1175 (A.F.C.M.R.1992); *United States v. Kroop,* 34 M.J. 628 (A.F.C.M.R. 1992); *United States v. Cottrell,* 32 M.J. 675 (A.F.C.M.R.1991); *United States v. Arthen,* 32 M.J. 541 (A.F.C.M.R.1990); *United States v. Parrillo,* 31 M.J. 886 (A.F.C.M.R.1990); *United States v. Serino,* 24 M.J. 848 (A.F.C.M.R.1987);

*United States v. Woodard,* 23 M.J. 514 (A.F.C.M.R.1986).

**6.** The finding of fact made in *Johanns* cannot be undone by judicial notice at trial, since the "existence and notice" of such a custom is no longer an "undisputed fact." *Appel,* 31 M.J. at 320. What is now required is "proof at trial" of the "existence and notice of the custom that has been violated." *Wales,* 31 M.J. at 309. Our decision today has no effect on that aspect of the precedents of the Court of Military Appeals in Air Force fraternization cases.

mander wanted to "redirect" him on that issue. The commander told Lieutenant Boyett close relationships between officers and enlisted members were "not looked too highly upon, and that it shouldn't be done." He advised Lieutenant Boyett "serious trouble," which included court-martial, could follow. Later, Lieutenant Boyett testified, he had another after-hours conversation with his squadron commander in which the commander used the example of a female officer court-martialed for her sexual relationship with an airman who worked for her. Even though there was a duty relationship involved in the example, Lieutenant Boyett said, he understood the prohibition to apply "generally." His thoughts on the subject were reinforced in a conversation with a master sergeant in the squadron and with "other people," all of whom agreed it was improper for an officer to have "too close" a relationship with an enlisted member. Lieutenant Boyett said his understanding of the custom of the Air Force was that sexual relations between officers and enlisted members, regardless of supervision, were prohibited and could result in criminal prosecution.[7]

In concluding their colloquy concerning Lieutenant Boyett's guilty plea to this contested specification, the trial judge asked whether Lieutenant Boyett admitted the existence of "a custom in the Air Force that prohibits sexual relations between officers and enlisted people, generally?" Lieutenant Boyett said he did. Lieutenant Boyett also told the judge he understood "making that admission ... under the reasoning [the judge] used earlier ... would essentially undermine or undercut [his] defense counsel's motion."

### THE APPEAL

Lieutenant Boyett now renews his attack on the specification, alleging it fails be-

cause neither the pleadings nor the proof show his conduct to be prohibited by an existing "custom" of the Air Force. The behavior which forms the basis of the specification was private, consensual, non-deviate sexual intercourse between unmarried adults who happened to be officer and airman, but without a supervisory or command relationship. Therefore, citing *Johanns*, Lieutenant Boyett avers his conduct was not subject to criminal sanctions in the Air Force.

The government argues this specification does not allege fraternization, but a different Article 133 offense which should be upheld on appeal. The specification states an offense under Article 133, according to the government, because it alleges "conduct unbecoming an officer" which is "wrong" even if not ordinarily considered criminal.[8] Further, the government avers, Lieutenant Boyett's sworn responses during his guilty plea inquiry show he was on notice that his behavior was "wrong" and could lead to court-martial.

### FRATERNIZATION OR NOT?

■ The government contends, as it did at trial, this specification does not allege fraternization. Certainly, it does not use language of the Manual for Courts–Martial, 1984, Part IV, paragraph 83f, (MCM) such as "fraternize," "on terms of military equality," or "in violation of the custom ... that officers shall not fraternize with enlisted persons on terms of military equality." The trial judge, apparently accepting the prosecutor's argument, did not use the elements of fraternization from the MCM in his explanation of the offense during the providence inquiry and advised both parties he considered the maximum punishment to include one year's confinement, rather than the two years prescribed for fraternization.

---

7. Although Air Force Regulation 35–62, Policy on Fraternization and Professional Relationships, 16 April 1990, came into effect during the period alleged in specification 5, trial counsel conceded it had not been "posted" to the base Master Reference Library until 15 October 1990. As a result, the trial judge did not discuss the implications of this policy directive with Lieutenant Boyett during the providence inquiry.

8. Fornication is not an offense in the military. See *United States v. Snyder*, 1 U.S.C.M.A. 423, 427, 4 C.M.R. 15, 19 (1952); *United States v. Johanns*, 17 M.J. at 866; *United States v. Wilson*, 32 C.M.R. 517, 518 (A.B.R.1962); *United States v. Ord*, 2 C.M.R. (A.F.) 84, 86–87 (A.F.B.R.1949).

*Compare* MCM, Part IV, paragraph 59c(2) *with* paragraph 59e; *See United States v. Arthen,* 32 M.J. at 547.

Unfortunately for the government's position, accepting the premise that the specification alleges, not fraternization, but another "unprofessional close personal relationship, including sexual intercourse," does not automatically lead to safe ground. As we have already discussed, offenses under Article 133 may not be created by the stroke of a pen in the act of signing a charge sheet because of due process, notice considerations. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Moreover, charging an offense under Article 133 without labeling it "fraternization," does not make proof easier. An offense may properly be charged under Article 133 even though specifically punishable under another article of the Code, but the elements of proof are the same, with the addition that the conduct be proved to be "unbecoming an officer and gentleman." MCM, Part IV, Paragraph 59c(2); *United States v. Arthen,* 32 M.J. at 544; *United States v. Parrillo,* 31 M.J. at 890.

Because Lieutenant Boyett was charged with misbehavior under Article 133, whether fraternization or not, we must determine whether he had fair notice of the criminality of his conduct.[9] For evidence of such "fair notice" we look to the trial transcript: specifically, to the stipulation of fact and Lieutenant Boyett's sworn admissions during the guilty plea inquiry.

9. We note that Captain Johanns also was charged under Article 133, not Article 134. *Johanns,* 17 M.J. at 863, n. 1.

10. Some view the *Johanns* majority's "finding of fact and law" as a rule of law defining what fraternization is prosecutable in the Air Force. The difference to this case is that one might conclude a rule of law would still apply to Lieutenant Boyett's conduct, even though we modify the rule for future cases.

Whatever the intent of the *Johanns* majority— I am in no position to know—the Court of Military Appeals has consistently treated the *Johanns* finding as one of fact. *See Johanns,* 20 M.J. at 160, where Chief Judge Everett said:

The court below apparently determined that no custom of that service prohibited Captain

## FACTUAL BASIS FOR THE GUILTY PLEA

Lieutenant Boyett pleaded guilty and readily admitted the existence of the custom he was charged with violating. He further admitted he was on notice that his conduct in violating this custom could subject him to criminal prosecution. Is that proof of the "existence and nature" of the custom sufficient to sustain Lieutenant Boyett's conviction? We believe it is. In our legal system, one may waive even the most precious rights: a guilty plea waives the right against self-incrimination and the right to a trial of the facts. R.C.M. 910(c)(3); *United States v. Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247, 253 (1969). We decline, therefore, to add to the guilty plea inquiry a requirement that the government also introduce proof of the factual basis for his plea. A trial court ought to be able to enter a finding of guilty on the basis of a provident plea alone, without receiving any evidence. Lieutenant Boyett, by his provident plea of guilty and sworn testimony before the trial judge, provided a factual basis for a finding that a custom existed which prohibited his conduct and that he was on notice that engaging in the prohibited behavior could result in criminal sanctions.

## *JOHANNS* REVISITED?

As we noted above, the majority decision in *Johanns* made a "finding of fact and law" which, in reality, was a finding of fact coupled with a conclusion of law.[10] Subsequent decisions have not

Johanns' private sexual relationships with several enlisted women. In the face of this determination by a tribunal which has factfinding powers, it must be assumed that Johanns did not receive notice from an Air Force custom or long-established practice that his amorous activities might transgress Articles 133 and 134.

*See also Appel,* 31 M.J. at 320; *Wales,* 31 M.J. at 308–09. That the *Johanns* majority's finding was primarily fact is evident from the extended discussion on the state of customs in the Air Force which preceded it. Having found an "eroded" custom which did not extend to "mutually voluntary, private, non-deviate sexual intercourse with an enlisted member, neither under his command nor supervision," the majority "found," quite logically, that Captain Johanns's

clearly distinguished the two parts. Today we do. We expressly limit the finding of fact by the *Johanns* majority to the state of customs reflected in the record in that case. We are not called upon to make a substitute finding of fact about the general state of Air Force customs against fraternization today, and we will not. The record of trial in this case contains a sufficient factual basis for our decision about Lieutenant Boyett's case, and his case is the only matter before us.

Lieutenant Boyett's providence inquiry responses make clear his officer pre-commissioning education and the climate of military leadership he found after entering active duty combined to impress on his mind the custom against officers "dating" and engaging in sexual intercourse with enlisted persons, regardless of the existence of a supervisory relationship. Lieutenant Boyett's responses are sufficient to show that, at the time of his offense, he was on notice of the existence of Air Force customs which proscribed the behavior charged in specification 5. On the basis of the record before us, we find "there is a factual basis for the plea" to specification 5, and we find Lieutenant Boyett's guilty plea to that specification provident. R.C.M. 910(e).

Before we conclude this discussion of Lieutenant Boyett's guilty plea, we must address the "finding of ... law" contained in the *Johanns* majority's decision. We have shown above that the combined finding of "fact and law" was actually a finding of fact and a legal conclusion, and we have limited the factual finding of *Johanns* concerning the state of Air Force customs against fraternization to that case. It follows, then, that the "finding of law" in *Johanns* is not binding on a different, later set of facts concerning the custom against fraternization. We are free to uphold Lieutenant Boyett's guilty plea if it is provi-

dent, and we have found it provident. Our ruling on the providence of Lieutenant Boyett's guilty plea does not commit us to a finding concerning the general contours of Air Force customs concerning fraternization. We leave to future cases such matters of adjudicative fact.

## OTHER ISSUES

■ We noted above the trial judge did not advise Lieutenant Boyett of all the elements of this Article 133 offense. He advised him there were two elements of specification 5:

The first is that on divers occasions, and by divers, the government is alleging a number of times, an indefinite number, but certainly more than once, between the dates of about 15 May 1990 and 30 June 1990, you engaged in unprofessional close personal social relationships, including sexual intercourse, with Airman [B], an enlisted person.

And the second element would be that under the circumstances your conduct was unbecoming an officer and a gentleman.

The trial judge omitted advice to Lieutenant Boyett that an element of the offense was that this "close personal social relationship, including sexual intercourse," violated a custom of the Air Force. *United States v. Fox*, 34 M.J. at 103; *United States v. Wales*, 31 M.J. at 309. Nevertheless, we find this omission not fatal in light of the discussion which ensued between the judge and Lieutenant Boyett. In a colloquy which covered more than seven pages of transcript, the judge carefully defined what it meant for Lieutenant Boyett to plead guilty to conduct unbecoming an officer and a gentleman as alleged in specification 5. Both in the stipulation of fact, Prosecution Exhibit 1, and personally, Lieutenant Boyett told the judge why he believed a custom of the Air Force existed

---

behavior, since it was not proscribed by such a custom, could not be prosecuted criminally. This latter "finding" was a conclusion of law, whether based on notions of due process and lack of notice or on the principle that a custom "ceases to exist when its observance has been long abandoned." MCM, 1969 (Rev.), para-

graph 213b. But it was a legal conclusion completely dependent on the underlying findings of fact, and can have no independent life apart from those findings. Of course, had the *Johanns* majority intended to craft a rule of law, there are significant questions about their legislative authority.

which prohibited the type of social relationship in which he engaged with Airman B. Lieutenant Boyett concluded by telling the judge he admitted "there is a custom in the Air Force that prohibits sexual relations between officers and enlisted people, generally." We find Lieutenant Boyett was clearly on notice that the existence of a custom of the Air Force which prohibited his conduct was an essential element of proof of specification 5. Knowing that, we find he knowingly and consciously gave up his right to a trial of the facts concerning specification 5. *Cf.*, *United States v. Care,* 40 C.M.R. at 253.

Lieutenant Boyett also has asserted the staff judge advocate erred by denying a defense request for delay in submitting clemency matters. A defense request for an additional 10 days to submit matters pursuant to R.C.M. 1105, dated 30 May 1991, was denied by letter dated 30 May 1991. A request for reconsideration, dated 3 June 1991, was denied by letter dated 3 June 1991. Both letters of denial, although signed by the staff judge advocate, used the authority line, "FOR THE COMMANDER." Lieutenant Boyett points out R.C.M. 1105(c)(1) says the convening authority must act personally on requests for delay in submission of matters, and asserts there is no indication the convening authority ever saw the request or acted on it personally.

This assertion need not detain us long. The "authority line" is used in Air Force correspondence when a staff officer is permitted to sign *for* a commander. Air Force Regulation 10–1, Preparing Written Communications, paragraph 3–4, 29 March 1985; *cf.*, *United States v. O'Connor*, 19 M.J. 673, 675 (A.F.C.M.R.1984). Use of the authority line does not signify the staff officer who signed "for the commander" usurped the commander's decision authority. *United States v. Meckler*, 6 M.J. 779, 781 (A.C.M.R.1978). In the absence of some evidence to the contrary, we will not assume that a usurpation occurred in this case.[11]  *United States v. Moschella,* 20 U.S.C.M.A. 543, 43 C.M.R. 383, 386 (1971); *United States v. Masusock,* 1 U.S.C.M.A. 32, 1 C.M.R. 32 (1951).

## CONCLUSION

On the basis of the entire record, the approved findings of guilty and sentence are hereby

AFFIRMED.

Senior Judge SNYDER and Judges GRUNICK and JOHNSON concur.

JAMES, Judge (concurring):

I agree with the disposition reached by my Brother Heimburg and with most of his reasoning. I agree with his view that we could not possibly have declared 10 years ago in *Johanns* what the state of facts would be in the cases which followed afterwards. I also agree with his view that the progeny of *Johanns* all descend from our opinion in that case, directly from our finding of fact, and that the conclusions of law reached by the Court of Military Appeals were made inevitable by our findings of fact. I write because I believe the lead opinion is too gentle. *Johanns* was wrong as a matter of fact, showed a confused understanding of the custom, was reached by faulty logic, and exceeded our authority. I would overrule it.

The *Johanns* proposition that there existed no such custom as a matter of law was unsupported by the opinion and refuted by the dissents of Chief Judge Hodgson and, in a different way, Judge Miller, and now by Lieutenant Boyett. I had no doubt then, and I have no doubt now, that, as a matter of *fact*, there existed then, now, and at the time of Lieutenant Boyett's trial a general custom of the Air Force that forbids its officers to associate casually with enlisted members (regardless of command

---

11. Lieutenant Boyett submitted a letter from his defense counsel, a personal letter, and 29 additional letters on 3 June 1991, which were considered by the convening authority prior to his action. In light of all the matters the convening authority had before him, we do not believe the one letter submitted after his action could have significantly impacted the decision.

and "supervisory" relationships) in social, romantic, and sexual settings.[12]

Such a drastic mistake needs an explanation. The majority in *Johanns* confused fraternization with caste and policy requirements with customs. That led it to mistaken analysis of the crucial factual issue and presumably to its faulty legal conclusion, too.

### I. Caste versus Custom

The *Johanns* majority conceded that there was such a custom before World War II and that there remained such a custom after the war, though perhaps modified. It then looked to "erosions" of the distinctions expressed in regulations about housing, messing, and the acknowledgement of marriages between officers and enlisted members and concluded that the custom about fraternization must have gone away with the caste distinctions that such social separations once suggested. *Johanns*, 17 M.J. at 865–67. Fraternization might once have involved caste, but those days are gone. It does not follow that all of the custom dealing with fraternization passed away, too.

It is a sidelight of *Johanns* that the majority paused to note the frequency with which fraternization cases have involved "some aberrant conduct." *Johanns*, 17 M.J. at 866–67. From that probably accurate sampling of the *appellate* data the majority mistakenly reasoned that because "officer-enlisted marriages are currently authorized," [13] the non-aberrant courtship

behavior that precedes marriages could not be prosecuted as a violation of the custom. The leap was too big. The outline of the custom is not established by reported appellate decisions, for they describe only episodes in which some criminal response is warranted, episodes which one would expect to involve extreme deviation. To say that the marriage is lawful and must be recognized does not imply that the community that establishes customs has changed its view about either the wisdom of such a marriage or the acceptability of the courtship that precedes it. Indeed, the relative rarity of such marriages—even today—is some evidence that the community which establishes customs has not changed its mind. Even today, 10 years after *Johanns*, one rarely encounters officer-enlisted romance that is not furtive.

There remains a custom against fraternization. Chief Judge Hodgson and Judges Snyder and Miller explained how and why in *Johanns*. 17 M.J. at 870, 871, 886–87. It remains because the community of soldiers and airmen recognizes that social relationships between a military superior and a military subordinate create perceptions of favoritism and familiarity that detract from the authority of officers to command unquestioning, undelayed obedience, even to orders that may result in inconvenience, hardship, or death. Fraternization remains an issue because it bears on leadership, discipline, and command. We are a community mainly of good soldiers who do not conduct themselves such that leadership,

**12.** The following published opinions of The Judge Advocate General suggest the vitality in the Air Force of the general custom against fraternization: OpJAGAF 1987/89, 3 Civil Law Op. 632 (lieutenant found unqualified for promotion because of unprofessional relationship with airman whom he married); OpJAGAF 1986/156, 3 Civil Law Op. 515 (lieutenant found unqualified for promotion because she fraternized with airman, among other reasons); OpJAGAF 1986/95, 3 Civil Law Op. 422 (same); OpJAGAF 1985/24, 3 Civil Law Op. 125 (officer involuntarily separated from service because of fraternization with enlisted husband of enlisted wife whom officer supervised); OpJAGAF 1985/13, 3 Civil Law Op. 104 (officer involuntarily separated because of fraternization); OpJAGAF 1983/35, 2 Civil Law Op. 559 (same; "There is a custom....").

It is emphatically *not* the point here that The Judge Advocate General holds the opinions reported, for the general existence of the custom is simply not susceptible to adjudication by lawyers on appellate review, as if a custom might be established by legal precedent. However, the advice given in the cited opinions, though sometimes deferential to the authority of this Court in its own jurisdiction, contrasts with the position taken in *Johanns*. *See also* OpJAGAF 1985/60, 3 Civil Law.Op. 178 (discussing effect of *Johanns* on adverse personnel actions); OpJAGAF 1971/69, 1 Civil Law Op. 189 ("There is a custom....").

**13.** As if they might be forbidden. I am dubious of any suggestion that the military services had any legal choice other than to "authorize" officer-enlisted marriages.

discipline, and command are impaired. Our views of our service are reflected in our views on what is and is not acceptable behavior. The *Johanns* majority, however, looked simplistically to erosion of caste distinctions and diagnosed the end of the custom prematurely, after only a superficial examination.

## II. Regulations and Customs

It is not relevant that, then or now, regulations dilute caste distinctions between officers and enlisted members. An officer can live next door to an enlisted family and yet still insist that the enlisted servicemember show good subordination and still forbid "Dick" and "Tom" conversations over the boundary fence. Officers and enlisted members can assemble at the same restaurants or social and athletic events—even combative sports—and yet the officer can and must insist before, during, and after on good subordination. The officer's superiors are perfectly correct to insist that the officer shall not permit himself to be so overcome by competitive zeal or to so lubricate his inhibitions as to behave as anything less than an officer. Caste is not the point. Leadership, discipline, and command are the points.

It is not relevant that certain of the technical functional "communities" of the Air Force changed their policies in ways that reduced the separation between officers and enlisted members. To be an officer requires one to be capable of correct behavior without that external support. I have no doubt that such social and residential circumstances as are now the norm expose all of us to easy opportunities to err, for the demand on the officer becomes more exacting as the setting resembles more closely a social setting in civilian life. But the fact that one is less helped and more vulnerable to breaches of the custom does not prove that the custom has died. The custom remains, even though it has become more difficult to meet its standard of behavior. The same might be said of drug abuse: Though the opportunity to abuse illegal drugs seems to be everywhere, the social and legal standards remain unchanged. The standards have not died just because "everyone is doing it."

The *Johanns* majority also confused the declarations of policies from the Air Staff with the disestablishment of the custom. Customs arise from common usage. *See generally,* Manual For Courts–Martial, United States, 1984, Part V, paragraph 60c(2)(b). They may not be created by declaration from on high.[14] Conversely, a custom might be stamped out by policy declarations. Thus, a conviction for disrespect by omitting to salute would not lie if the Secretary decreed through a regulation that saluting was forbidden. However, the policy positions cited by the *Johanns* majority did not purport to put officers and enlisted members on socially equal footings. They simply eliminated some vestiges of a distant past's caste system. The one does not necessarily doom the other.

## III. Judicial Excess

Those, however, are not the only reasons, or even the principal reasons why I would overrule *Johanns.* I would do that be-

14. Of course, a command from on high, stated in a regulation, becomes equally enforceable under Article 92, UCMJ, 10 U.S.C. § 892 (1988), and it has the advantage of certainty and convenience in proof. The oft-repeated suggestion that the Air Force would do well to proclaim its view in a regulation may be correct, and the Air Force has done so. *See* Air Force Regulation 35–62, "Policy on Fraternization and Professional Relationships" (16 April 1990), and AFR 30–1, "Air Force Standards of Conduct," para. 7 (4 May 1983). One of those regulations, AFR 30–1, declares itself to be nonpunitive (though perhaps evidence of our customs), and the other seems not to have been intended to be punitive, though we do not decide that today.

Regulations, however, are now and have always been legally irrelevant when the prosecution is not for disobedience under Article 92 but is instead for "conduct unbecoming" under Article 133 or the parallel conduct under Article 134. In the latter cases, the policy proclamations of the headquarters are not offended, but the commonly held views of the responsible members of the community may be, and those views may supply the needed notice in the form of customs. Regulations are simply red herrings in cases like *Johanns* and this case, in which the pleadings allege violations of Articles 133 or 134. The fact that there may be a better or easier way to deal with the problematical conduct does not mean that a conviction gotten the hard way is illegal.

cause this Court had no business attempting to decree in such general terms the presence or absence of customs in the Air Force. Its duties required only that it determine whether it was necessary (or perhaps how it was necessary) to prove the existence of such a custom as that officer was accused of having violated and then to test that record to determine whether the proof requirement in that case had been met.

We are judges, not the keepers of the Air Force's history or the arbiters of its traditions. Four judges of this Court declared the custom dead after a poll of the expressions of some "functional area" decision-makers and then purported to declare the collective view of thousands as to what the thousands had established by their behavior. While political and sociological pollsters might be able to do it, we are in a poor position to take polls, and we did a poor job. When military appellate judges do so much more than they need and more than they should, they risk great and needless damage to institutions of unique importance to the nation's security.

Confused about its role, the *Johanns* majority held, as a matter of law, that the custom was "so eroded as to make *criminal* prosecution ... unavailable." (Emphasis in original.) That exaggerates the role of this Court. If a custom is found to exist, that ends the inquiry. If the custom exists at all, then notice is given, due process is satisfied, and a conviction may be sustained under Article 133 or 134.[15] This Court had no legal need to discriminate between customs that can be enforced under Articles 133 and 134 and those which can be enforced administratively, but it

clearly did. *Johanns*, 17 M.J. at 869 n. 21. Volunteering to rank customs in that way, this Court inspected the custom unnecessarily for "erosion" and clearly concluded that enough was left to satisfy administrative needs, *id.*, and in my view that is enough—*any* is enough—to satisfy all needs. Thus, the conclusion of law in *Johanns* was based on the same sort of imprecise analysis that led to its conclusion of fact, and it is equally defective.

These flaws so infected the decision in *Johanns* that it would be not excess to overrule it explicitly and finally, and I would.

DIXON, Chief Judge, joined by Senior Judges O'HAIR, LEONARD, and McLAUTHLIN (concurring in part and dissenting in part):

I concur in the majority disposition of this case except for the affirmance of specification 5 of the Charge. In my view, the trial judge erred by denying the defense motion to dismiss this specification as a matter of law. I believe existing legal precedent requires this Court to find appellant's plea of guilty to specification 5 improvident.[16] I would dismiss specification 5 and affirm the sentence as adjudged.[17]

Given the statutory mandate of Article 66, UCMJ, this Court can affirm only those findings that we find are correct in both fact and law. In exercising that responsibility, we are obligated to determine what the law was *at the time of trial* and to fairly and consistently apply it to the case before us. With respect to the conduct alleged in specification 5, I have no difficulty ascertaining what the state of the law

---

**15.** Neither is it significant that, according to the *Johanns* majority, enforcement of the custom lapsed during World War II and that fraternization of that era did not affect discipline. The question before the Court in 1983 was whether there existed such a custom, not its enforcement history and not the effects of conduct that deviated from the customary.

**16.** In *United States v. Wales*, 31 M.J. 301 (C.M.A. 1990), Chief Judge Everett writing the lead opinion stated:

Likewise, we conclude that, if the Air Force elects to prosecute and punish private sexual

intercourse between an officer and an enlisted person not under his command or supervision, then ... it must promulgate specific punitive regulations forbidding the unwanted conduct.

**17.** A dismissal of specification 5 would not necessitate a rehearing on the sentence since the trial judge entered the following statement on page 82 of the record of trial: "With respect to specification 5, that specification played no part in my determination of an appropriate sentence. I would have imposed the same sentence even without that specification."

was within the Air Force when appellant was tried.[18] Finding the law clear and unambiguous, I cannot find appellant's conviction on specification 5 correct in law.[19]

This Court in *United States v. Johanns,* 17 M.J. 862 (A.F.C.M.R.1983) held that "as a matter of fact and law the custom in the Air Force against fraternization has been so eroded as to make *criminal prosecution* against an officer for engaging in mutually voluntary private, non-deviate sexual intercourse with an enlisted member, neither under his command nor supervision, unavailable." I can point to no holding by this Court which has been more widely discussed or controversial. Yet, for the past 10 years this holding has precluded the criminal disposition of cases involving the type of conduct alleged in specification 5. The very essence of judicial precedents is to ensure that like cases will be treated the same. Accordingly, I can find no persuasive rationale for permitting appellant's conviction on this specification to stand.

I cannot subscribe to the majority's retroactive re-interpretation of the *Johanns* holding, limiting it solely to the facts of that case. As the majority correctly observes, the *Johanns* holding has influenced a decade of Air Force cases. It has done so because this Court found *as a matter of law* that conduct like that described in specification 5 could not be the basis of criminal prosecution in the Air Force.[20] Just as *Johanns* has dictated the outcome in a number of subsequent cases, it should also be the controlling factor in this case.[21] Regardless of how this Court may choose to apply its current view of the law pertaining to sexual intercourse between officers and enlisted personnel in the future, I believe we are duty bound to recognize that *Johanns* was the controlling precedent 2 years ago when this case was tried.

I am perplexed by the majority's use of the guilty plea inquiry to uphold appellant's conviction of specification 5.[22] I readily agree that a plea of guilty is the strongest proof known to law. However, we are not dealing here with factual proof concerning

18. As Judge Rives observed in *United States v. Parrillo,* 31 M.J. 886, 889 (A.F.C.M.R.1990): "There was a time—not so long ago—when the criminality of Parillo's conduct with subordinate enlisted personnel would not be seriously questioned. However, this has not been true since the celebrated case of *United States v. Johanns.*" Continuing he wrote: "The appellate courts in *Johanns* held that an unmarried Air Force captain was guilty of neither conduct unbecoming an officer (Article 133, UCMJ), nor conduct prejudicial to good order and discipline or of a nature to discredit the armed forces (Article 134, UCMJ) when he engaged in 'mutually voluntary, private, non-deviate sexual intercourse, with an enlisted member, neither under his command nor supervision'."

19. I note that appellant did not flaunt his relationships with the enlisted member named in specification 5. The record establishes that the two individuals never went anywhere in public together. She visited appellant at his off-base residence approximately 12 times where they engaged in sexual intercourse on several occasions.

20. Whether or not a custom exists is a question of fact. However, I submit whether or not a custom can be the basis for criminal prosecution is a matter of law.

21. I cannot distinguish this case from *United States v. Cottrell,* 32 M.J. 675 (A.F.C.M.R.1991).

In *Cottrell,* our Court found a plea of guilty to a fraternization specification improvident and set aside the conviction. The accused in that case admitted the existence of, and his awareness of the Air Force custom against fraternization. He also told the military judge he knew the relationship was wrong. However, the specification fell because proof was lacking of any supervisory relationship. In *United States v. Appel,* 31 M.J. 314 (C.M.A.1990), the U.S. Court of Military Appeals reversed our affirmance (the accused having pled guilty) of one specification of fraternization. The decision rests on the absence of a command or supervisory relationship during the period alleged. In light of these cases, it is not the findings of fact that this Court reached in *Johanns* that deters me from voting with the majority in this case. Rather it is the legal conclusion reached in *Johanns* that a command or supervisory relationship is necessary in order "to make criminal prosecution" available. Following the legal precedents of *Johanns, Appel* and *Cottrell,* I must vote to overturn appellant's conviction on the one specification.

22. Appellant's plea of guilty to specification 5 did not waive his claim that the specification failed to state an offense. R.C.M. 905(e), 907(b). I think it reasonable to surmise that appellant proceeded with a plea of guilty, despite his legal objection, in order to preserve the sentence protection afforded by the pretrial agreement.

the conduct in question. Instead, we are dealing with the question of whether appellant can be criminally prosecuted even if the conduct alleged is true. Whether or not a military member can be prosecuted for a particular type of conduct is, in my view, clearly a question of law. An accused cannot make conduct, which is otherwise not subject to criminal sanction, a crime merely by entering a plea of guilty. *United States v. Arthen,* 32 M.J. 541, 544 (A.F.C.M.R.1990); *United States v. Lumagui,* 31 M.J. 789, 790 (A.F.C.M.R.1990). While a plea of guilty may dispense with the requirement to prove particular conduct, it cannot create a crime.